# Dana Ray Edmonds

## v.

# Commonwealth of Virginia

Record No. 841249

Decided April 26, 1985, at Richmond

Present: All the Justices

J. *Patterson Rogers, 3rd*, for appellant.
Thomas D. *Bagwell, Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee.

POFF, J., delivered the opinion of the Court.

In a bench trial, conducted in two stages as required by Code §§ 19.2-264.3, -264.4, the trial court convicted Dana Ray Edmonds under a two-count indictment charging capital murder in the commission of robbery while armed with a deadly weapon and robbery. After hearing evidence adduced at the penalty stage, the court entered an order on December 12, 1983 imposing the death penalty on the first count and life imprisonment on the second. By order dated January 3, 1984, the court vacated the earlier order and directed the probation officer to prepare the report required by Code § 19.2-264.5. Thereafter, the court granted the defendant's request to be examined by a private psychiatrist. Upon consideration of the probation report, the psychiatric evidence, and testimony in mitigation, the court entered orders in May 1984 confirming the penalties originally imposed. Pursuant to Code §§ 17-110.1, -110.2, we have consolidated Edmonds' appeal of the capital murder conviction with the automatic review of the death penalty and accorded the case priority on our docket. Edmonds assigns no error to his robbery conviction, and the judgment on that count has become final.

By way of preface, Edmonds argues that the capital-murder statutes are unconstitutional, both facially and as applied. He acknowledges, however, that "[a]lmost every argument raised by Appellant has already been decided against him in prior cases." He points to no exceptions, we have found none, and, applying unbroken precedent, we reject his constitutional complaints.

## I. GUILT TRIAL

Mounting a two-fold attack on the sufficiency of the evidence, Edmonds contends that the Commonwealth failed to prove (1) that the killing was premeditated and (2) that the killing occurred in the commission of robbery. We will summarize the evidence in the light most favorable to the Commonwealth and then consider these contentions separately.

### A. *The Evidence*

John Elliott, the victim of this crime, operated a small, one-man grocery store in the City of Danville. Elliott, 62 years of age, was five feet, seven inches tall, weighed less than 120 pounds, and suffered with tuberculosis, emphysema, scarring of the pancreas, hardening of the arteries, and constricted pericarditis. Yet, acquaintances described him as "feisty", "outspoken", and given to the use of vulgar language, and customers believed that he kept a revolver on a shelf beneath the cash register.

About 2:30 p.m. on Friday, July 22, 1983, Kenneth Richardson entered the store, stayed a few minutes, and left. During his visit, Elliott was sitting in a wooden chair in an open space near a "meat case" located at the rear of the store. At 2:35 p.m., Margaret Clark saw Edmonds walking toward the store. Shortly before 2:45 p.m., Leonard McDaniel, a wholesale egg distributor, arrived at the store. A stool was wedged against the door, the only entrance, but he succeeded in pushing the door ajar. When he entered, he saw Elliott's empty chair overturned on the floor. Blood was spattered on the floor, the meat cooler, and the counter where the cash register was kept. On the floor behind the meat cooler, McDaniel found Elliott's body lying in a pool of blood.

McDaniel turned and saw Edmonds and another man standing at the front door. He told them to stay where they were, that Elliott had been murdered, and that he was going to call the police. Edmonds disregarded the admonition and walked to the rear of the store to look at Elliott's body. He then returned to the front of the store, put on a glove, and placed his hand on a brick lying on a soft-drink cooler. McDaniel was "sure he was going to hit me with it", but he persuaded Edmonds to go outside. McDaniel observed "quite a bit" of blood on the tops and sides of Edmonds' tennis shoes but could not identify any blood on his clothes.

Responding to McDaniel's call, the police arrived at 2:47 p.m. Edmonds fled when he heard the sirens approaching. Police Sergeant David Stowe took numerous photographs of the crime scene and the corpse. A handkerchief "was pulled through the mouth and secured in the back." Stowe seized two butcher knives, each stained with blood; a glove; a brick containing strands of human hair; Elliott's false teeth "fairly well soaked" in blood; and several other items. Droplets of blood were on the chair and on the floor leading to the front door. Bloody footprints, apparently made by tennis shoes, led from the pool of blood behind the meat cooler to the floor behind the cash register counter. Sitting on the counter was "a chocolate drink bottle still cold". Under that counter, Stowe found a toy cap pistol, but a search disclosed no firearms in the store. Except for a few pennies, the cash register was empty.

Approximately 15 minutes before the police arrived, Kenneth Richardson had noticed "a stack of ones in the register" which he estimated to be "about $40.00 or a little more than that." Allen Dix, 12 years old, arrived at the store just before McDaniel got there, was unable to open the door, and looked in a window. Dix testified that he saw a man he later identified as Edmonds "stooping below the cash register." A witness who saw Edmonds about an hour after the killing testified that his pockets were "bulging out." Shortly thereafter, Edmonds gave three dollars to each of three children, and later he was seen spending money at a convenience store. Edmonds was using only one-dollar bills.

Anita Curley, who lived across the street from the store, testified that Elliott had told her that Edmonds had stolen some watches from his store and was no longer welcome as a customer. Lisa Clark, another neighbor, testified that Edmonds had told her some time before the killing that Elliott had accused him of the theft and that he had responded, "What if I did?" According to Clark, Edmonds "said he was going to get John."

Dowin Dalton, a soft-drink salesman, testified that Elliott had told him he was having "trouble" with "a black guy that lived on Ivy Street". When Dalton made his regular delivery on Wednesday, Elliott tried to persuade him to return on Friday because, he said, "That damn nigger down yonder is coming back Friday and kill me." Laverne Coles, Edmonds' girlfriend, testified that he asked her on Saturday, "Baby . . . do you know how serious a murder charge is?" That night, Edmonds was arrested near the bus station. He gave his address as 228 Ivy Street.

Dr. William Massello performed the autopsy on Elliott's body. Elliott sustained "a large laceration" above the hairline of the scalp and a corresponding "circular fracture of the skull." These injuries, which resulted from a blow by a blunt instrument such as the "corner of a brick", did not "necessarily" cause the victim to lose consciousness. The blood droplets on the chair and those on the floor leading to the front door came from the scalp wound. A bruise was found "on the right side of the neck . . . behind the ear." The arms contained bruises and abrasions, consistent with those made by the "grip" of human hands. The "most serious injury . . . was a cutting wound to the right side of the neck". A sharp instrument had been inserted in "a vertical direction" into "the muscles of the neck", and "there was some twisting motion of the object" as it moved "upward in . . . a left to right direction." Bleeding from this wound, which cut the carotid artery, was "rapid and massive". Although the victim expired in less than five minutes, he remained able to talk because the larynx was intact.

The pumping of the heart caused blood from the neck wound to "spurt" and collect on the lower part of a refrigerator located near the spot where the body was found. In the examiner's opinion, the pattern of blood indicated that the victim was not standing erect when the wound was inflicted. He also agreed that if the assailant and the victim had been facing each other in a standing position when the artery was severed, the assailant "would have been hit with a spurt of blood."

Edmonds, 21 years of age, was six feet, four inches tall and weighed 179 pounds. In the first of three interviews, Edmonds told Detective Claude Slayton that he had not been in the store but had seen "a black guy with a beard . . . run into the store". In a second statement admitting he had entered the store, he said that a James Fuller had been with him and that Fuller had "hit [Elliott] in the head with something" and then cut his throat. Confronted with Fuller's alibi, Edmonds told Slayton that he "would go ahead and tell . . . the truth this time."

His final account of events is contained in the transcript of a tape-recorded interview and a typed statement bearing his signature. Edmonds went to the store alone to buy a cold drink. Elliott pointed a pistol at his head and asked about the two missing watches. Edmonds protested that he had paid Elliott $3.00 apiece for those watches. Elliott cursed him and threatened to shoot him. Edmonds picked up a brick from the floor and threw it, striking

Elliott on the head. Elliott dropped the gun but retrieved it; Edmonds grabbed a butcher knife, and "[t]he man got cut." Edmonds tried to telephone the police but was unable to complete the call. Because he did not "want [anybody] to come, to know that this had happened", he placed a stool against the door. Seeing "some young guy" at the window, he "ducked down" and hid behind the cash register counter. At this time, Elliott was still alive and calling for help. Edmonds said that he had picked up a handkerchief and a bag of candy as he left the store, but he denied that he had taken a gun or stolen the bills from the cash register. When he returned to his home that day, he took a bath and burned his clothes in a bucket. On Saturday before he was arrested, he called the police from the bus station and "told them [he] had seen somebody go in the place" on Friday afternoon.

## B. *Premeditation*

The defendant contends that the evidence adduced by the Commonwealth was insufficient to prove that the killing was "willful, deliberate and premeditated" as required by Code § 18.2-31(d). As explained in the statements he made to the police, the killing was an accident growing out of a struggle over a gun, and he asks us to "remand for a new trial on the charge of murder in the course of robbery, felony murder, under Va. Code Ann. § 18.2-32."

Whether a killing was accidental or intentional and premeditated is a question of fact and, absent eyewitness testimony or a voluntary confession, that question necessarily turns upon the import of circumstantial evidence. *Epperly* v. *Commonwealth*, 224 Va. 214, 232, 294 S.E.2d 882, 892-93 (1982). Edmonds acknowledges on brief that proof of premeditation, "however slight or momentary", is sufficient. We are of opinion the evidence supports the trial judge's decision in this case.

The record reveals a history of enmity between Edmonds and Elliott. Elliott had accused the defendant of stealing two watches and had told him he was no longer welcome in his store. According to Lisa Clark, Edmonds acknowledged that he had not denied the accusation and, in her presence, had threatened to "get" his accuser. Two days before the day of the crime, Elliott told Dowin Dalton that he was having trouble with a black man who lived on Ivy Street (the address Edmonds gave the police) and that he believed that he was "coming back Friday" to kill him.

Only minutes before Edmonds entered the store on Friday, Elliott was seen sitting in a chair in the middle of the floor. The blood droplets found on the chair came from the scalp wound. The concave fracture of the skull above the hairline tends to show that Elliott was seated when struck with the brick and that the blow was delivered from above. The bruises on his arms and the droplets of blood leading to the front door indicate that Edmonds dragged his victim to the door, barricaded the only entrance to the store, and then pulled or carried him behind the meat cooler where he could not be seen from the window. There, he picked up a butcher knife, plunged it vertically into the muscles of Elliott's neck, twisted the blade, and severed the carotid artery. As appears from the location of the blood spurts on the refrigerator, Elliott, dazed by the blow to his head, was on his knees or prostrate on the floor when the knife wound was inflicted, and the absence of blood on the assailant's clothes suggests that he was positioned behind his victim at the time. Finally, with Elliott's body gagged and concealed from view, Edmonds emptied the cash register, fled from the scene as the police approached, burned his clothes, and, just before he was arrested near the bus station, called the police and attempted to cast suspicion on some unidentified person.

Aside from the reasonable inferences raised by this evidence, other circumstances combine to contradict Edmonds' account of events. The only "gun" discovered on the premises by the police was a toy pistol on a shelf under the cash register. The brick which Edmonds claimed he "threw" was found, not on the floor, but on the drink cooler, and the only physical evidence of mutual combat was an overturned chair and a package of disposable razors lying on the floor.

■ Considering the disparity in age, size, and health, the brutality of the two attacks, the concealment of the victim's body, and the defendant's efforts to divert suspicion from himself, *see Epperly*, 224 Va. at 232, 294 S.E.2d at 892, the trial judge was justified in disbelieving Edmonds' self-serving statements. We hold that the evidence was sufficient to support the judge's finding that the killing was willful, deliberate, and premeditated.

## C. *Robbery*

Edmonds argues that, even if the killing was premeditated, the homicide offense does not rise to the level of capital murder in the commission of robbery. He says that the larceny occurred only

after the killing was consummated and that the evidence is insufficient to prove that robbery was the motive for the killing. Accordingly, he urges us to "remand for new trials on the charges of murder in the first degree and petit larceny."

Edmonds cites our recent decision in *Bunch v. Commonwealth*, 225 Va. 423, 304 S.E.2d 271, *cert. denied*, 464 U.S. 977 (1983), where we affirmed a conviction of capital murder in the commission of robbery.

> [The victim] may or may not have been alive at the time [Bunch] stole her property, and she may even have been dead for some time when he accomplished the theft. Neither of these eventualities is material, however; the important considerations are that robbery was the motive for the killing and that Bunch had the intent to rob when he killed [his victim]. *Whitley v. Commonwealth*, 223 Va. 66, 73, 286 S.E.2d 162, 166, *cert. denied*, 459 U.S. 882 (1982); *see also Wm. Patterson v. Commonwealth*, 222 Va. 653, 664, 283 S.E.2d 212, 219 (1981).

225 Va. at 440, 304 S.E.2d at 280-81; *see also Branch v. Commonwealth*, 225 Va. 91, 94-96, 300 S.E.2d 758, 759-60 (1983).

Edmonds claimed in his written statement that the sole purpose of his visit to Elliott's store was to buy a cold drink. But a person accused by a shopkeeper of shoplifting is unlikely to return to the shop to make a purchase, and, rejecting Edmonds' claim, the trial judge was justified in relying on the sworn testimony and the physical evidence adduced at trial. All the offenses—the initial assault, the fatal stabbing, and the larceny—were committed at some point within the ten-minute interval between the time Margaret Clark saw Edmonds on his way to the store and the time Leonard McDaniel arrived. Death from the neck wound was not instantaneous. Elliott was calling for help as Edmonds was crouching behind the cash register, and it is reasonable to believe that the gag was applied to stifle further outcry and to facilitate the theft.

In light of the inferences raised by this sequence of events and the time factor involved, we are of opinion that the evidence supports the conclusion that the killing and the theft were interdependent objects of a common criminal design, and we will affirm the conviction of capital murder in the commission of robbery.

## II. THE PENALTY TRIAL

### A. *Evidence of Future Dangerousness*

The defendant maintains that the trial judge "erred in admitting the expert testimony of the [Commonwealth's] psychologist on future dangerousness when such testimony is not based on a full evaluation of the Appellant".

Edmonds objected at trial to the expert qualifications of Dr. Arthur Centor, a forensic psychologist and licensed clinical psychologist with a professional practice spanning 31 years, and on appeal "renews that objection . . . for the record." We approved Dr. Centor's qualification as an expert witness in 1966, *Rollins* v. *Commonwealth*, 207 Va. 575, 580-81, 151 S.E.2d 622, 625-26 (1966), and we find no merit in this objection.

During the first hearing at Edmonds' penalty trial, Dr. Centor testified that "there are strong indications that there is a high probability of future dangerousness." His opinion was based upon an evaluation of the defendant's record of criminal convictions, presentencing reports accompanying those convictions, testimony at the guilt trial, the defendant's statements to the police, and the autopsy report. Following the first hearing, he conducted a two-hour interview with Edmonds, administered various tests, and, at the second hearing, reaffirmed his earlier opinion.

Edmonds questions the probative value of Dr. Centor's opinion. Relying upon the testimony of the expert witness called by the defense and noting that Dr. Centor had agreed on cross-examination that a person tends to become less violent as he matures, Edmonds argues that "a psychological prediction of dangerousness . . . is too unreliable."

This argument was answered by the Supreme Court in *Barefoot* v. *Estelle*, 463 U.S. 880 (1983), when it upheld the admission of an expert's prediction of future dangerousness, even though it was made without benefit of a personal examination of the patient.

We are unconvinced . . . that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case.

*Id.* at 901.

Nevertheless, Edmonds insists that the Commonwealth failed to establish the "dangerousness" predicate for the death penalty, *i.e.*, that "there is a probability that [he] would commit criminal acts of violence that would constitute a continuing serious threat to society". Code § 19.2-264.2. In making such a determination, the factfinder is entitled to consider not only the defendant's "past criminal record of convictions", *id.*, but also "any matter which the court deems relevant to sentence", Code § 19.2-264.4(B); "the prior history of the defendant or . . . the circumstances surrounding the commission of the offense", Code § 19.2-264.4(C); and the heinousness of the crime, *Quintana* v. *Commonwealth*, 224 Va. 127, 151, 295 S.E.2d 643, 655 (1982), *cert. denied*, 460 U.S. 1029 (1983).

Edmonds detailed his own "past history" in the statements he made to Dr. Centor during the two-hour interview. He dropped out of high school, left home, and went to live with his paramour and her four young children. Although Edmonds never held a "steady job", he developed a drug habit which cost him "ten dollars a day". He "smoked pot laced with PCP", "used acid, or LSD", "sniffed cocaine", and "stayed high nearly all the time". He admitted "going after his girl with an ax" and "cutting Ricky Totten", but denied "hitting Ronnie Watkins with a brick".

As reflected in his probation report, his criminal record included three felony convictions (burglary and grand larceny) and 13 misdemeanor convictions, including five convictions of crimes of violence against the person (assault and battery). On July 21, 1983, the day before the crimes at bar were committed, Edmonds was placed in the Community Services Program to "work off" $701.00 in accumulated fines and court costs.

This evidence illuminates and reinforces the expert's opinion, and we hold that the trial judge was justified in finding a probability of future dangerousness.

## B. *Evidence of Vileness*

The judge based the death penalty on the "vileness" predicate as well. Code § 19.2-264.2 provides that the factfinder may impose the supreme penalty upon a finding that the defendant's "conduct in committing the offense . . . was outrageously or wantonly vile . . . in that it involved . . . an aggravated battery to the

victim". Edmonds argues that "the wounds suffered by the deceased do not establish an aggravated battery."

■ In our first decision following enactment of the capital murder statutes in 1977, we defined the term "aggravated battery" to mean "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979). Proof of the multiple wounds Elliott sustained fully satisfies that test. Indeed, we believe that the neck wound, considered alone, constitutes an aggravated battery within the intendment of the definition in *Smith*. The savage, methodical manner in which it was inflicted, leaving the victim to suffer an interval of agony awaiting death, evinces a criminal animus more culpable than that involved in a battery which causes sudden death. *Cf. Godfrey* v. *Georgia*, 446 U.S. 420 (1980).

## C. *Propriety of the Sentence*

■ Under Code § 17-110.1(C), we are required to "consider and determine" whether the death penalty "was imposed under the influence of passion, prejudice or any other arbitrary factor". The defendant complains that the trial court failed to consider the probation report required by Code § 19.2-264.5 before entering the original sentencing order, and he argues that the judge's "subsequent actions did not cure the prejudice Appellant suffered thereby" and, thus, that the final sentencing order "was influenced by passion, prejudice, or other arbitrary factors."

The record belies the argument. Granting the defendant's motion, the trial judge vacated the original sentencing order on January 3, 1984, scheduled a new penalty hearing, and allowed the defendant a period of four months in which to marshall additional evidence in mitigation. On May 3, 1984, the judge reviewed the probation report and the evidence adduced at the first hearing, heard the testimony of the private psychiatrist called by the defense and that of Dr. Centor concerning his personal examination of the defendant, compared the crime at bar with those in other capital cases decided in the Commonwealth, and entered final judgment imposing the death penalty.

We agree that the original sentencing order was entered in error, but we find nothing arbitrary in the conduct of the penalty trial. On the contrary, the trial judge recognized the omission, va-

cated the order, directed the probation officer to prepare a report, authorized a private psychiatric examination, and afforded the defendant a second opportunity to show good cause why the death penalty should not be imposed. We are of opinion that the error was cured, and absent anything to support the claim that the final sentencing order was the product of passion or prejudice, we reject the defendant's assignment of error.

Even so, we must consider whether the penalty imposed in this case is excessive or disproportionate to that imposed in similar cases.

■ As required by Code § 17-110.1(E), we have accumulated the records in all capital cases tried under the revised statutes and reviewed by this Court, including those in which a sentence of life imprisonment was imposed. Our opinions in cases in which the death penalty was imposed, based solely upon the vileness predicate, are annotated in *Jones* v. *Commonwealth*, 228 Va. 427, 450-51, n. 3, 323 S.E.2d 554, 567 (1984); *see also Washington* v. *Commonwealth*, 228 Va. 535, 323 S.E.2d 577 (1984). Opinions in cases where the death penalty was based upon both statutory predicates are cited in *Tuggle* v. *Commonwealth*, 228 Va. 493, 517-18, 323 S.E.2d 539, 554 (1984).

We have examined all of these cases, giving special attention to those involving murder in the commission of robbery. None, of course, is factually identical to another. In some, the crime may seem more brutal, the defendant's conduct more depraved, and the evidence of future dangerousness more compelling than that in the case at bar. In other cases, the converse may be true. But, insofar as it is possible to quantify "vileness" and "dangerousness" and to correlate the culpability of one criminal act resulting in death with that of another, we hold that the sentence imposed upon Edmonds is not "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17-110.1(C)(2).

## D. *Appellate Review*

■ Finally, defense counsel charges that "there does not exist an adequate appellate review of death sentence cases in Virginia" and, he asserts, "If the Court has determined to forego its power to commute then this Appellant and all others so situated have lost their constitutional rights to a fair hearing and review."

We have reversed capital convictions in four appeals. *Ball* v. *Commonwealth*, 221 Va. 754, 273 S.E.2d 790 (1981); *Martin* v. *Commonwealth*, 221 Va. 436, 271 S.E.2d 123 (1980); *Justus* v. *Commonwealth*, 220 Va. 971, 266 S.E.2d 87 (1980); *Johnson* v. *Commonwealth*, 220 Va. 146, 255 S.E.2d 525 (1979). And in *Wm. Patterson* v. *Commonwealth*, 222 Va. 653, 283 S.E.2d 212 (1981), we commuted the death sentence to imprisonment for life for prejudicial error committed in the conduct of the penalty trial.

Counsel cites no capital conviction we have affirmed and no death sentence we have upheld which he believes should have been decided otherwise. A reading of our published opinions will show painstaking consideration of every question raised in every capital case we have reviewed, and we reject counsel's charge.

Finding no reversible error in the conduct of the guilt trial or the penalty trial, we will affirm the judgment.

*Affirmed.*