Present: All the Justices

DARYL RENARD ATKINS

v. Record No. 000395   OPINION BY JUSTICE CYNTHIA D. KINSER
                                        September 15, 2000
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF YORK COUNTY
N. Prentis Smiley, Jr., Judge


Daryl Renard Atkins was convicted in the Circuit Court of York County of the 1996 capital murder of Eric Michael Nesbitt and sentenced to death.  On appeal, we affirmed his conviction, Atkins v. Commonwealth, 257 Va. 160, 180, 510 S.E.2d 445, 457 (1999), but remanded the case to the circuit court for a new penalty proceeding due to an improper jury sentencing verdict form, id. at 177-79, 510 S.E.2d at 456-57.[1]  At resentencing, a different jury found that there is a probability that Atkins would commit acts of violence in the future that would constitute a continuing serious threat to society, and that his conduct in committing the capital murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim beyond the minimum necessary to accomplish the act

---

[1] Atkins was also convicted of abduction, robbery, and use of a firearm while committing those offenses.  In his first appeal, he did not challenge these convictions.  Atkins, 257 Va. at 163 n.1, 510 S.E.2d at 447 n.1.

of murder." The jury fixed Atkins' punishment at death. At a separate sentencing hearing, the circuit court imposed the death penalty in accordance with the jury verdict. Atkins now appeals that sentence.

Atkins assigns eight errors on appeal. After considering those issues and conducting our mandated review pursuant to Code § 17.1-313(C), we find no error in the judgment of the circuit court and will affirm the imposition of the death penalty.[2]

## I. ISSUES REGARDING MITIGATION

In three related assignments of error, Atkins raises the question whether the circuit court improperly inhibited the jury's consideration of mitigating evidence. First, he asserts that Virginia's bifurcated jury system, as applied when a case is remanded for a new sentencing hearing before a different jury, unconstitutionally limits a defendant's ability to present relevant evidence from the guilt phase of the previous trial. Second, Atkins claims that the circuit court erred in limiting his examination of Frederick T. Lyons, an investigator with the York County

---

[2] We recited the evidence in the record in our prior decision, Atkins, 257 Va. at 165-69, 510 S.E.2d at 449-51. We need not repeat that evidence here, except to the extent necessary as part of our analysis of Atkins' assignments of error in this appeal.

sheriff's office, thereby denying Atkins the opportunity to present a complete defense, including mitigating evidence, at his new sentencing hearing. Finally, Atkins argues that the circuit court erred in refusing to instruct the jury about mitigating factors. We find no merit to these claims.

Initially, to the extent that Atkins contends that Virginia's bifurcated jury system is constitutionally defective because he could not, at his resentencing, present evidence and argue "residual doubt" with regard to his guilt in the commission of the crime, that contention has been previously addressed and rejected by this Court.[3] See Stockton v. Commonwealth, 241 Va. 192, 210-11, 402 S.E.2d 196, 206-07, cert. denied, 502 U.S. 902 (1991) (defendant not allowed to introduce evidence and argue "residual doubt" at new sentencing hearing); Frye v. Commonwealth, 231 Va. 370, 393, 345 S.E.2d 267, 283 (1986) (defendant cannot contest correctness of guilty verdict at

---

[3] In addition, the Commonwealth filed a motion in limine to prohibit Atkins from presenting evidence or argument with regard to any factual issue concerning his guilt. The circuit court granted the motion, and ordered Atkins and his counsel "to refrain from any attempt, during the resentencing proceeding, to inquire into, comment upon or argue any factual issue relative to [Atkins'] guilt." Atkins has not assigned error to the circuit court's order granting the motion in limine. See Rule 5:17.

sentencing phase); see also Franklin v. Lynaugh, 487 U.S. 164, 173 (1988) (defendant is not entitled to jury instruction on "residual doubt"). We find no reason to depart from our precedent.[4]

However, Atkins contends that the evidence he sought to introduce through the testimony of Lyons was not offered for the purpose of creating "residual doubt" about his guilt. Specifically, during direct examination, Atkins' counsel asked Lyons, "[A]fter you advised [Atkins] of [his Miranda] rights, did [Atkins] confess to you his involvement in the murder of Eric Nesbitt?" According to Atkins, the information that he sought to elicit by that question was the fact that he had admitted his participation in the murder of Nesbitt. Atkins argues that such information was relevant to the issues of Atkins' remorse and his cooperation with law enforcement authorities, both of which are proper subjects of mitigating evidence.

---

[4] That precedent does not mean that a defendant can never present evidence from the guilt phase of a trial at a subsequent resentencing hearing. Depending on the facts of each case, certain guilt-phase evidence may also be relevant to issues at resentencing, especially if the vileness predicate is at issue. Even when such evidence is relevant, a defendant still cannot argue or present evidence concerning "residual doubt." Stockton, 241 Va. at 210-11, 402 S.E.2d at 206-07.

The Commonwealth objected to the question, contending that it called for a hearsay statement. The Commonwealth also noted that, while Atkins confessed to Lyons his involvement in the abduction, robbery, and murder of Nesbitt, Atkins denied that he was guilty of capital murder. In the confession to Lyons, Atkins maintained that his accomplice alone was the "triggerman." Thus, according to the Commonwealth, for Lyons to appropriately answer the propounded question, he would have to tell the jury that Atkins denied that he pulled the trigger, which would have been contrary to the circuit court's prior ruling that evidence regarding Atkins' guilt would not be admitted at the resentencing hearing.

The circuit court sustained the Commonwealth's objection on the basis that the testimony being elicited from Lyons was hearsay.[5] We agree.

---

[5] Atkins' counsel proffered to the court that Lyons would also testify that Atkins admitted his involvement in certain crimes committed in the City of Hampton. The orders showing Atkins' convictions for those crimes had already been introduced into evidence and, as noted by the Commonwealth, reflected whether Atkins had pled guilty to those crimes. The circuit court sustained the Commonwealth's objection to this additional evidence also on the basis that it was hearsay.

After the court sustained the Commonwealth's objections, Atkins' counsel did not ask Lyons any additional questions and advised the court that Lyons was no longer needed as a witness.

In Atkins' initial appeal to this Court, we considered this same evidence and held that no exception to the hearsay rule applied which would allow Lyons to testify about the content of Atkins' statement to him.  Atkins, 257 Va. at 176, 510 S.E.2d at 455.  The proffer of this evidence at the resentencing hearing does not change the hearsay analysis.  According to Code § 19.2-264.4(B), mitigating evidence relevant to sentencing is "subject to the rules of evidence governing admissibility."  See Cherrix v. Commonwealth, 257 Va. 292, 309, 513 S.E.2d 642, 653, cert. denied, ___ U.S. ___, 120 S.Ct. 177 (1999) (subject to rules of evidence governing admissibility, trial court has discretion under Code § 19.2-264.4(B) to determine what evidence may be adduced in mitigation of offense); Coppola v. Commonwealth, 220 Va. 243, 253, 257 S.E.2d 797, 804 (1979), cert. denied, 444 U.S. 1103 (1980) (same); but see O'Dell v. Commonwealth, 234 Va. 672, 701-02, 364 S.E.2d 491, 508, cert. denied, 488 U.S. 871 (1988) (holding that hearsay evidence contained in postsentence report is admissible based on language of Code §§ 19.2-264.5 and -299).

In any event, we believe that the information that Atkins sought to elicit from Lyons improperly would have interjected at the new sentencing hearing a question about

6

Atkins' guilt. In that statement to Lyons, Atkins denied that he was the "triggerman" and accused his accomplice of shooting Nesbitt. Atkins, 257 Va. at 175, 510 S.E.2d at 455. As we previously stated, a defendant is not allowed to argue or present evidence of "residual doubt" at a new sentencing hearing. Stockton, 241 Va. at 211, 402 S.E.2d at 207.

Finally, Atkins contends that the circuit court erred by denying certain proposed instructions on the mitigation factors contained in Code § 19.2-264.4.[6] Specifically, Atkins requested the court to instruct the jury that it may consider, in mitigation, Atkins' age at the time of the offense, his mental retardation, and any other evidence that would tend to favor a sentence of life imprisonment. However, the record before us shows that Atkins withdrew the requested instruction. Regardless, this Court has consistently held that defendants being sentenced for capital murder are not entitled to jury instructions that list the specific types of mitigating factors a jury may consider. George v. Commonwealth, 242 Va. 264, 283, 411 S.E.2d 12, 23 (1991), cert. denied, 503 U.S. 973 (1992);

---

[6] Instead, the circuit court instructed the jury that it should consider any evidence presented in mitigation of the offense that tended to make life imprisonment without

Eaton v. Commonwealth, 240 Va. 236, 257, 397 S.E.2d 385, 398 (1990), cert. denied, 502 U.S. 824 (1991); Gray v. Commonwealth, 233 Va. 313, 351, 356 S.E.2d 157, 178, cert. denied, 484 U.S. 873 (1987). We will not depart from our prior decisions today.

## II. ISSUES REGARDING THE JURY

Atkins raises two issues with regard to the composition and selection of the jury. He first contends that the circuit court erred in denying his motion to strike the entire venire because it did not accurately represent the demographic make-up of the population of York County. Second, he challenges the Commonwealth's use of one of its peremptory strikes.

With regard to the first issue, Atkins argued at trial that the venire, which contained only three Black members, did not represent a fair cross-section of the community. According to Atkins' counsel, York County's population is 30 percent Black. In denying Atkins' motion, the circuit court noted that the venire had been randomly selected.

Systematic exclusion of a "distinctive group in the community" must be shown in order to establish that a defendant's constitutional right to a fair jury selection

_____

the possibility of parole a more appropriate punishment than death.

8

system has been violated.  *Chichester v. Commonwealth*, 248 Va. 311, 324, 448 S.E.2d 638, 647 (1994), *cert. denied*, 513 U.S. 1166 (1995).  Atkins does not contend that there was such exclusion, nor does the record in this case suggest any systematic exclusion of Black members of the community from the venire.  Thus, we find no merit in Atkins' claim.

On the second issue, Atkins contends that the Commonwealth's exercise of a peremptory strike to remove the only remaining Black juror violated the rule established in *Batson v. Kentucky*, 476 U.S. 79 (1986), holding that peremptory strikes based solely upon a juror's race violate the Equal Protection Clause.  In deciding whether a peremptory strike is racially motivated in violation of *Batson*, a trial court "must consider the basis of the challenge[], the reasons proffered for the strike[], and any argument presented that such reasons, even if race-neutral, are pretextual, to determine whether the challenger has met [the] burden of proving purposeful discrimination in the selection of a jury panel."  *Chandler v. Commonwealth*, 249 Va. 270, 277, 455 S.E.2d 219, 223, *cert. denied*, 516 U.S. 889 (1995).  We will reverse a trial court's findings that there was no purposeful discrimination in the striking of a juror and that the

reasons proffered by the Commonwealth were racially neutral only where such findings are clearly erroneous.  Id.

The juror in question testified that he took medication for a thyroid condition and that the medication caused him to feel "bombed out" and "drowsy" at times. Because of the juror's medical condition, the Commonwealth expressed concern about the juror's ability to pay close attention to the evidence.  The circuit court determined that the Commonwealth had proffered a sufficiently race-neutral reason to strike the juror, and we conclude that this finding was not clearly erroneous.  See Stockton, 241 Va. at 209, 402 S.E.2d at 205-206 (concern about juror's attentiveness was race-neutral reason for striking juror).

III.  MOTION TO STRIKE COMMONWEALTH'S EVIDENCE

Next, Atkins asserts that the circuit court should have granted his motion to strike the Commonwealth's evidence at the new sentencing hearing because that evidence was insufficient to prove either the future dangerousness or the vileness aggravating factor.  Atkins makes no argument on this assignment of error beyond this mere assertion.  Upon reviewing the record, we find evidence sufficient to prove beyond a reasonable doubt both Atkins' future dangerousness and the vileness of his crime.

To establish the future dangerousness predicate for imposition of the death penalty, the factfinder may consider a defendant's past criminal record, a defendant's prior history, the circumstances surrounding the commission of the offense under consideration, and the heinousness of the crime. Edmonds v. Commonwealth, 229 Va. 303, 312, 329 S.E.2d 807, 813, cert. denied, 474 U.S. 975 (1985). In the present case, the Commonwealth presented evidence showing that Atkins had at least 18 prior felony convictions for such crimes as attempted robbery, robbery, abduction, breaking and entering with the intent to commit larceny, grand larceny, maiming, and use of a firearm. In addition, the jury not only heard the details of several robberies that Atkins committed, including one in which Atkins hit a victim over the head with a bottle, but also learned about an incident during which he shot a woman in the stomach without provocation. Thus, we conclude that there was sufficient evidence to support the jury's finding of Atkins' future dangerousness.

With respect to the vileness predicate, Code §§ 19.2-264.2 and -264.4(C) define vileness as conduct that "was outrageously or wantonly vile, horrible or inhuman" involving "torture, depravity of mind or an aggravated battery to the victim." Proof of either torture, depravity

11

of mind, or an aggravated battery is sufficient to support a finding of vileness.  Bunch v. Commonwealth, 225 Va. 423, 442, 304 S.E.2d 271, 282, cert. denied, 464 U.S. 977 (1983).

Based on testimony from the assistant chief medical examiner who autopsied Nesbitt's body, the jury learned that Atkins shot Nesbitt eight times.  Three of the gunshots caused mortal wounds.  One of those gunshots penetrated the left chest cavity and perforated both lungs and the heart; the second one, to the left lateral back, perforated the right lung and aorta; and the third fatal shot perforated the arm, re-entered the abdomen, and perforated the iliac artery.  However, none of the fatal shots was immediately lethal; they would not have caused immediate unconsciousness or paralysis; and Nesbitt may have survived several minutes before dying from internal bleeding.  Nesbitt also sustained several scrapes or abrasions, including a large linear abrasion on his right forehead.

This Court has defined the term "aggravated battery" used in Code §§ 19.2-264.2 and –264.4(C) to mean "'a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder.'"  Goins v. Commonwealth, 251 Va. 442, 468, 470

12

S.E.2d 114, 131, cert. denied, 519 U.S. 887 (1996) (quoting Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979)).  Thus, we find sufficient evidence to support the jury's finding that Atkins' murder of Nesbitt was "outrageously or wantonly vile."  Code §§ 19.2-264.2 and -264.4(C).

IV.  PREJUDICE AND PROPORTIONALITY REVIEW

Whenever a sentence of death is imposed, this Court is required to determine whether that sentence "was imposed under the influence of passion, prejudice or any other arbitrary factor; and [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Code § 17.1-313(C).  With regard to these two questions, both assigned as errors by Atkins, we initially note that Atkins has presented no argument that his sentence of death was influenced by passion, prejudice or any other arbitrary factor, nor has our review of the record revealed any such improper influence.

With respect to the proportionality question, Atkins does not argue that his death sentence is disproportionate to the penalties imposed for crimes similar to the one he perpetrated, namely premeditated murder with a firearm in the commission of a robbery, where the death penalty was

13

imposed on the basis of both the future dangerousness and vileness predicates.  Nor, given our previous cases, could he do so convincingly because juries in this Commonwealth regularly impose the death penalty for capital murders comparable to the one at issue in this case.[7]  See Graham v. Commonwealth, 250 Va. 79, 80, 81 and n.*, 83, 89, 459 S.E.2d 97, 97 and n.*, 98-99, 102, cert. denied, 516 U.S. 997 (1995) (death sentence imposed for murder in commission of robbery based on both vileness and future dangerousness predicates; defendant had 14 prior convictions; victim shot while lying in parking lot); Strickler v. Commonwealth, 241 Va. 482, 487-88, 496-98, 404 S.E.2d 227, 231, 236-37, cert. denied, 502 U.S. 944 (1991) (death sentence imposed upon findings of vileness and future dangerousness where defendant with eight felony convictions took victim to deserted field and killed her; death was not instantaneous); Gray, 233 Va. at 341, 352-54, 356 S.E.2d at 172-73, 179-80 (defendant with at least 13 prior felony

---

[7] Pursuant to Code § 17.1-313(E), we have accumulated the records of all capital murder cases reviewed by this Court.  Those records include not only cases in which the death penalty was imposed, but also those in which a life sentence was imposed and the defendant appealed to this Court.  Orbe v. Commonwealth, 258 Va. 390, 404, 519 S.E.2d 808, 816 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1970 (2000) (citing Whitley v. Commonwealth, 223 Va. 66, 82, 286 S.E.2d 162, 171, cert. denied, 459 U.S. 882 (1982)).

14

convictions sentenced to die based on future dangerousness and vileness after forcing victim into his car, taking victim's wallet and robbing victim's store, and then driving to secluded area where defendant shot victim six times after assuring victim that he would not be harmed); Edmonds, 229 Va. at 304, 307, 312-14, 329 S.E.2d at 809-10, 813-15 (during robbery, victim sustained multiple wounds including stab wound to neck; defendant had 3 felony and 13 misdemeanor convictions; death sentence imposed based on findings of vileness and future dangerousness); Briley v. Commonwealth, 221 Va. 563, 566-68, 578, 580-81, 273 S.E.2d 57, 58-60, 66-68 (1980) (defendant convicted of capital murder in commission of robbery and sentenced to death based on findings of vileness and future dangerousness; victim forced to lie on floor during rape of victim's mother and murder of both parents prior to victim's death by gunshot; defendant had numerous criminal convictions including armed robbery and attempted murder).

Focusing on the statutory directive that this Court's proportionality review take into account not only the crime but also the defendant, see Code § 17.1-313(C), Atkins, however, does assert that he is mentally retarded and thus cannot be sentenced to death. He bases his argument upon his purported full scale IQ of 59 and contends that the

15

death penalty has not been imposed on any defendant in this Commonwealth with an IQ score as low as his. In response, the Commonwealth points out that the evidence was in conflict regarding the question whether Atkins is mentally retarded. Quoting from Penry v. Lynaugh, 492 U.S. 302 (1989), the Commonwealth also contends that execution of a defendant who is mentally retarded does not contravene the practices that were condemned when the Bill of Rights was adopted or the evolving standards of decency.

Atkins' full scale IQ score was based on a test known as the Wechsler Adult Intelligence Scale-III (WAIS-III), which was administered to him by a forensic clinical psychologist, Dr. Evan Stuart Nelson.[8] According to Dr. Nelson, Atkins' full scale IQ of 59 means that Atkins is mildly mentally retarded. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) 40 (1994). However, Dr. Nelson also acknowledged that Atkins might have scored two or three points higher if he had not been mildly depressed when Dr. Nelson administered the test.

Dr. Nelson further explained that a diagnosis of mental retardation is not simply a question of an IQ score.

---

[8] On the same test, Atkins also had a verbal IQ score of 64 and a performance IQ score of 60.

Mental retardation also involves the inability to function independently as compared to the norm for persons of the same age.  Consequently, a diagnosis of mental retardation is based on an individual's IQ scores along with that person's ability to function in the world.  Finally, despite his opinion that Atkins is mildly mentally retarded, Dr. Nelson admitted that Atkins' capacity to appreciate the criminal nature of his conduct was impaired, but not destroyed; that Atkins understood that it was wrong to shoot Nesbitt; and that Atkins meets the general criteria for the diagnosis of an antisocial personality disorder.

In addition to Dr. Nelson's testimony, the jury heard testimony from Dr. Stanton E. Samenow, a forensic clinical psychologist called as a witness by the Commonwealth. Based on two interviews with Atkins, Dr. Samenow "sharply disagree[d]" with Dr. Nelson's conclusion that Atkins is mildly mentally retarded.  Instead, Dr. Samenow testified that Atkins is of at least average intelligence.  Dr. Samenow based his conclusion on Atkins' vocabulary, knowledge of current events, and other factors from the Wechsler Memory Scale, Wechsler Adult Intelligence Scale and Thematic Apperception Test.  For example, Atkins knew that John F. Kennedy was the president in 1961.  He also

17

correctly identified the last two presidents, as well as Virginia's current governor.  Dr. Samenow further explained that Atkins used "sophisticated words" such as "orchestra," "decimal," and "parable;" that Atkins could recall information Dr. Samenow asked him to remember; and that Atkins could put together a story involving cause and effect.

Dr. Samenow also reviewed Atkins' academic records and noted that, while Atkins had passed the Literacy Passport Test, his academic performance had been terrible and that his school records were "punctuated with statements" by teachers about Atkins' lack of motivation and concentration, his poor study habits, and his ability to do better in school.  Finally, Dr. Samenow, like Dr. Nelson, opined that Atkins was able to appreciate the criminality of his conduct and to conform his behavior to the requirements of the law, and that Atkins satisfies most of the criteria for the diagnosis of an antisocial personality disorder.

The Supreme Court of the United States has ruled that imposition of the death penalty on a mentally retarded defendant with the approximate reasoning capacity of a seven-year-old child does not violate the Eighth Amendment prohibition against cruel and unusual punishment solely

18

because of the defendant's mental retardation.  Penry, 492 U.S. at 336, 340.  In that case, the Court recognized that the abilities and experiences of mentally retarded individuals vary.  Thus, the Court was unwilling to conclude that all mentally retarded people, "by virtue of their mental retardation alone, and apart from any individualized consideration of their personal responsibility[,] inevitably lack the cognitive, volitional, and moral capacity to act with the degree of culpability associated with the death penalty."  Id. at 338.  The Court also refused to rely on the concept of "mental age," noting that it is problematic in several respects and that courts have generally been reluctant to use it as a basis for excusing a defendant from criminal responsibility.  Id. at 339.  However, the Court did state that a "sentencing body must be allowed to consider mental retardation as a mitigating circumstance in making the individualized determination whether death is the appropriate punishment in a particular case."  Id. at 337-38.

In Virginia, the mental retardation of a defendant is one of the factors that may be considered in mitigation of capital murder.  Code § 19.2-264.4(B).  Accordingly, the jury in the present case heard extensive, but conflicting,

testimony from Dr. Nelson and Dr. Samenow regarding Atkins' mental retardation. As in any case, it was the responsibility of the jury to assess the credibility of the witnesses and to determine the weight to be afforded to specific evidence. Yarbrough v. Commonwealth, 258 Va. 347, 364, 519 S.E.2d 602, 610 (1999). The jury was instructed in the present case to consider any evidence in mitigation of the offense, and the jury obviously found that Atkins' IQ score did not mitigate his culpability for the murder of Nesbitt. See Yeatts v. Commonwealth, 242 Va. 121, 145, 410 S.E.2d 254, 268 (1991), cert. denied, 503 U.S. 946 (1992)(jury found defendant's mild mental retardation, based on full scale IQ of 70, did not mitigate capital murder offense, and this Court perceived no reason on appeal to disturb that finding). The question of Atkins' mental retardation is a factual one, and as such, it is the function of the factfinder, not this Court, to determine the weight that should be accorded to expert testimony on that issue. Saunders v. Commonwealth, 242 Va. 107, 115, 406 S.E.2d 39, 43, cert. denied, 502 U.S. 944 (1991).

In conducting the mandated proportionality review and examining the records accumulated pursuant to Code § 17.1-313(E), we do not find a capital murder case in which testimony indicated that a defendant had a full scale IQ as

low as 59.[9]  Because Atkins asserts that he cannot be

sentenced to death due to his alleged mental retardation,

we must consider, as part of our proportionality review,

the same evidence heard by the jury regarding Atkins'

mental capacity.  In examining that evidence, we find it

significant that both Dr. Nelson and Dr. Samenow agreed

that a diagnosis of mental retardation involves more than

merely determining a person's IQ score; it also requires

consideration of an individual's adaptive functioning.[10]

With regard to the issue of adaptive functioning, Dr.

Nelson testified that, in determining an individual's

---

[9] In Mackall v. Commonwealth, 236 Va. 240, 256, 372
S.E.2d 759, 769 (1988), cert. denied, 492 U.S. 925 (1989),
we upheld a sentence of death for a defendant with an IQ of
64 who was convicted of capital murder committed during a
robbery.  See also Correll v. Commonwealth, 232 Va. 454,
467, 352 S.E.2d 352, 359 (1987)(death penalty upheld for
defendant who scored 68 on IQ test).
    In Freeman v. Commonwealth, No. 830920 (Va. Jan. 25,
1984), this Court examined the capital murder conviction of
a defendant with a full scale IQ of 61.  We denied that
defendant's petition for appeal, in which the only assigned
error was the failure of the trial court to allow him to
withdraw his guilty plea.  That defendant argued on brief
that his "limited intelligence" and "fear" caused him to
plead guilty.

[10] According to the DSM-IV, "[t]he essential feature of
Mental Retardation is significantly subaverage general
intellectual functioning . . . that is accompanied by
significant limitations in adaptive functioning in at least
two of the following skill areas: communication, self-care,
home living, social/interpersonal skills, use of community
resources, self-direction, functional academic skills,
work, leisure, health, and safety . . . ."  DSM-IV at 39.

21

ability to function independently, it was necessary to talk with family members, and to review school and employment records.  He further stated that he had followed through on that inquiry by reviewing Atkins' academic records and talking to Atkins' parents.  As a result of the inquiry, Dr. Nelson reported that Atkins had received poor grades, failed many tests and classes, and was placed in remedial academic courses on a number of occasions.  He also stated that Atkins' parents described a number of deficits, but Dr. Nelson never elaborated on the nature of those deficits.  In other words, Dr. Nelson never identified an area of significant limitation in Atkins' adaptive functioning other than what he termed Atkins' "academic failure."[11]

In contrast, Dr. Samenow provided the following explanation when asked whether Atkins has any impairment in his adaptive functioning:

> Well, Mr. Atkins never lived independently. In other words, he was not a self-supporting member of society.  However, he told me he was able to wash his clothes, wash and dry his clothes, he used his

_____

[11]  The dissent acknowledges that a diagnosis of mental retardation requires not only a finding of subaverage intellectual functioning but also limitations in two or more adaptive skill areas.  However, the dissent is likewise unable to point to any finding by Dr. Nelson regarding deficits in Atkins' adaptive functioning other than his poor academic performance.

22

parents' washing machine and dryer. He told me — when I asked him if he was able to cook, he gave me his recipe for cooking chicken.

This Defendant, . . . as I understand it, lived a life in which he didn't work, and I don't mean just didn't hold a job, that he didn't do, but then again there are a lot of 18-year-olds who maybe haven't worked because they've been in school. But he didn't work in school either.

So the point is he chose a certain — to live a certain way of life, and there was no lack of ability to adapt and to take care of basic needs, certainly.

Thus, considering "both the crime and the defendant," Code § 17.1-313(C), and the record before us, we cannot say that Atkins' sentence of death is excessive or disproportionate to sentences generally imposed in this Commonwealth for capital murders comparable to Atkins' murder of Nesbitt. We are not willing to commute Atkins' sentence of death to life imprisonment merely because of his IQ score. Dr. Nelson and Dr. Samenow agreed that an IQ score is not the sole definitive measure of mental retardation. Both experts also testified that Atkins was able to appreciate the criminality of his conduct and understood that it was wrong to shoot Nesbitt.

Accordingly, we perceive no reason to commute Atkins' sentence of death and will affirm the judgment of the circuit court.

<u>Affirmed</u>.

JUSTICE HASSELL, with whom JUSTICE KOONTZ joins, concurring in part and dissenting in part.

                                    I.

Code § 17.1-313, which requires that this Court review a sentence of death, states in relevant part that we must consider "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  I dissent because I believe that the imposition of the sentence of death upon a mentally retarded defendant with an IQ of 59 is excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

                                    II.

Dr. Evan S. Nelson qualified as an expert witness on the subjects of clinical and forensic psychology.  He testified on behalf of the defendant, Daryl Renard Atkins. Dr. Nelson reviewed the defendant's school records, psychological test data, and certain information related to the defendant's capital murder conviction and his prior convictions.  Dr. Nelson also interviewed members of the defendant's family.

Dr. Nelson administered the Wechsler Adult Score, also referred to as the WAIS-III intelligence test, to the

                                    24

defendant.  This test was designed to measure the defendant's IQ.  Dr. Nelson stated:

> "There are a number of IQ tests on the market. Some of them are for special niches of population.  But the WAIS is one of the two that is recognized throughout the United States as a standard for assessing intelligence.
> "It's the one that's most frequently cited, for example, in state laws for identifying who qualifies for a learning disability or a mental retardation, the one that's most often cited in Federal disability laws for making determinations involving an IQ or neurologic deficits."

According to Dr. Nelson, there are 13 major subsections of the test that he administered to the defendant.  Dr. Nelson administered all 13 of the major subsections to the defendant and determined that the defendant had a full-scale IQ of 59.  Dr. Nelson observed:

> "Mental retardation is about two things.  Number one, it's about an IQ of around 70 or below, and there [is] some space there, 70 or plus or minus five points is the official criteria. . . .
> "Secondly, adaptive behavior.  Being mentally retarded isn't just a low score on this test.  It's about lacking certain abilities to function independently compared to what you'd expect for other persons your age.  That's a really important criteri[on].  Because there are some people who can score really well or really poorly on this test but who either do or don't function well in society.  So you have to go out and find out by talking with family members and school records and employment records, if they have any, about how they function in the world at large.  You need the two of them together to be able to say someone is mentally retarded."

25

Dr. Nelson, who is a specialist in the assessment of mental illnesses, opined that the defendant was mentally retarded based upon his IQ score of 59 and his limited capacity for adaptive behavior. Dr. Nelson pointed out that in addition to the defendant's low IQ score of 59, the defendant's public school academic records "are crystal clear that he has been an academic failure since the very beginning." Dr. Nelson testified that the "lack of variation" in the defendant's performance on the IQ test indicates that the test was properly administered and that the defendant was not "faking" when he took the test.

Even though the defendant was not classified as mentally retarded when he was a student in the Hampton Public Schools Division, his academic performance was very poor. He scored below the 20th percentile in almost every standardized test he took. He failed the second and tenth grades. He was socially advanced from the fourth grade to the fifth grade.

When the defendant was an eighth-grade student, he received failing grades in all his classes, and he scored in the 15th percentile of standardized achievement tests. When he was a tenth-grade student, he scored in the 6th percentile. The defendant, when a student in high school, was placed in lower-level classes for slow learners and

classes with intensive instruction for remedial deficits. His grade point average in high school was 1.26 out of a possible 4.0. The defendant did not graduate from high school.

Dr. Stanton E. Samenow qualified as an expert witness in the subjects of clinical psychology and forensic psychology. He testified on behalf of the Commonwealth. Dr. Samenow interviewed the defendant twice. Dr. Samenow did not administer an IQ test to the defendant. Rather, he asked the defendant some questions.

Dr. Samenow testified that the defendant was able to relate to him certain recent events and historical facts. For example, the defendant knew the name of the Governor of Virginia and knew that former President John F. Kennedy's son had died in an airplane accident. The defendant was also able to associate certain words and to tell a story utilizing certain pictures. Dr. Samenow did not give the defendant a complete intelligence test, but essentially picked and chose certain questions from various tests to query the defendant.

For example, during cross-examination, Dr. Samenow testified:

> "As I indicated . . . I gave portions of the Wechsler Memory Scale, the selected items of the Wechsler Adult Intelligence Scale, namely, from

similarities, vocabulary and comprehension, and I also gave the Thematic Apperception Test, which in itself is not an intelligence test but it certainly does give some indication of a person's use of syntax, language, vocabulary, and these were portions.  I want to underscore, and I said this yesterday, portions of those tests."

Dr. Samenow also gave the following testimony:

"Q:  In your interviews with the Defendant, did you ascertain any evidence suggestive of mental retardation?
"A:  I found absolutely no evidence other than the IQ score that I knew of, because I reviewed a number of materials.  No evidence did I find other than that indicating that the Defendant was in the least bit mentally retarded.
"Q:  Do you have an expert opinion as to the Defendant's intellect?
"A:  He is of average intelligence, at least.
"Q:  Explain the basis of how you came to this conclusion.
"A:  Largely though several indices.  One is the vocabulary and syntax that he used in talking with me.  And I have many examples."

Significantly, Dr. Samenow testified that Dr. Nelson's calculations of the scores on the tests administered to the defendant to ascertain the defendant's IQ were correct.  Dr. Samenow did not conduct a full evaluation of the defendant, nor did he use questions from the most recent test when he examined the defendant.

III.

"Mental retardation refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the

28

following applicable adaptive skill areas: Communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests itself before age 18."

Carroll J. Jones, <u>An Introduction to the Nature and Needs of Students with Mild Disabilities:  Mild Mental Retardation, Behavior Disorders, and Learning Disabilities</u>, 39 (1996).

Persons with an IQ level in the range of 50 through 55 to 70 are classified as having mild mental retardation. The following table of diagnostic criteria for mental retardation appears in <u>Kaplan & Sadock's Comprehensive Textbook of Psychiatry</u> 2598, Benjamin J. Sadock & Virginia A. Sadock eds., (7th ed. 2000):

| "Mental Retardation | IQ range | Mental age (years) |
| --- | --- | --- |
| Mild | 50-69 | 9 to under 12 |
| Moderate | 35-49 | 6 to under 9 |
| Severe | 20-34 | 3 to under 6 |
| Profound | Below 20 | Less than 3" |

According to Doctors Kaplan & Sadock:

"Mild mental retardation (I.Q., 55 to 70) characterizes the largest group of persons with mental retardation, possibly as many as 85 percent of the total.  These individuals appear similar to nonretarded individuals and often blend into the general population in the years before and after formal schooling.  Many achieve academic skills at the sixth grade level or higher, and some graduate from high school.  As adults, many of these individuals hold jobs,

marry, and raise families — yet at times they may appear slow or need extra help negotiating life's problems and tasks."

Id. The evidence of record shows that the defendant's full-scale IQ score of 59 falls within the range considered mild mental retardation. Less than one percent of the American population at large has a score of 59 or below.

I would commute the defendant's sentence of death to life imprisonment without the possibility of parole because I believe that the sentence of death is "excessive . . . to the penalty imposed in similar cases, considering both the crime and the defendant." Upon my independent review of the entire record in this case, see Vinson v. Commonwealth, 258 Va. 459, 472, 522 S.E.2d 170, 179 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 2226 (2000), it is clear that this defendant is mentally retarded. This defendant, who has an IQ of 59 and a limited capacity for adaptive behavior, has the cognitive ability or mental age of a child between 9 and 12 years of age. This Court has never approved of the imposition of the death penalty upon a defendant who is mentally retarded and has an IQ as low as 59.

I simply place no credence whatsoever in Dr. Samenow's opinion that the defendant possesses at least average intelligence. I would hold that Dr. Samenow's opinion that the defendant possesses average intelligence is incredulous

30

as a matter of law. Indeed, I am perplexed that Dr. Samenow, who did not administer a complete IQ test to the defendant and admittedly asked the defendant questions based upon bits and pieces of outdated tests to supposedly evaluate the defendant, would opine that this defendant possesses at least average intelligence.

Dr. Samenow admitted that he does not contest the manner in which Dr. Nelson computed the defendant's IQ scores. Additionally, Dr. Samenow admitted that some of the questions he administered to the defendant were based upon a test developed in 1939. Dr. Samenow described this test as "[a]n old standard," yet, he used this obsolete test even though he acknowledged that the Ethical Principles of Psychologists and Code of Conduct, Ethical Standards 2.07 (1992) of the American Psychological Association, prohibits the use of obsolete tests and outdated test results and specifically states that "psychologists do not base such decisions or recommendations on tests and measures that are obsolete and not useful for the current purpose."

Moreover, according to the testimony and medical literature, an assessment of mental retardation is predicated upon the subject's IQ score and the subject's adaptive behavior. Dr. Samenow, however, could not validly

31

opine about the defendant's adaptive behavior because he had not interviewed anyone who had observed the defendant prior to his incarceration.  Additionally, Dr. Samenow's methodology is flawed because when he improperly administered portions of certain tests, he failed to comply with the relevant instructions for those tests.

Also, I place no credence in Dr. Samenow's opinion that the defendant possesses an average intelligence because of the defendant's vocabulary and his ability to relate certain historical facts to Dr. Samenow.  It is common knowledge that many children as young as eight years old are capable of relating the same historical facts that the defendant described and possess a vocabulary similar to the defendant's vocabulary.

I recognize that the United States Supreme Court has held that the imposition of the death penalty upon mentally retarded criminal defendants does not violate the Eighth Amendment to the United States Constitution.  See Penry v. Lynaugh, 492 U.S. 302, 340 (1989).  However, the issue in this appeal is not whether the imposition of capital punishment upon a mentally retarded criminal defendant violates the federal Constitution.  Rather, the issue in this appeal is whether under Code § 17.1-313 the imposition of the sentence of death is excessive or disproportionate

to the penalty imposed in similar crimes, considering both the crime and the defendant. I would answer that question in the affirmative. I believe that the imposition of the sentence of death upon a criminal defendant who has the mental age of a child between the ages of 9 and 12 is excessive, considering both the crime and the defendant.

IV.

I recognize that this defendant has a history of violent criminal behavior. I also recognize that this defendant is clearly a significant danger to society. Therefore, I would commute this defendant's sentence to life imprisonment without the possibility of parole.

JUSTICE KOONTZ, with whom JUSTICE HASSELL joins, dissenting.

I agree with the view expressed in detail in Justice Hassell's dissent in this case. For the reasons expressed therein and for the following reasons, I would also commute Daryl Renard Atkins' death sentence to imprisonment for life without the possibility of parole. Code §§ 17.1-313 and 53.1-165.1.

Justice Hassell correctly observes that "[t]his Court has never approved the imposition of the death penalty upon a defendant who is mentally retarded and has an IQ as low

33

as 59."  In footnote 9, the majority refers to Mackall v. Commonwealth, 236 Va. 240, 372 S.E.2d 759 (1988), to note that this Court has upheld, however, a sentence of death for a defendant with an IQ of 64 who was convicted of capital murder committed during a robbery.  In another part of its opinion, the majority further correctly notes that "Dr. Nelson also acknowledged that Atkins might have scored two or three points higher if he had not been mildly depressed when Dr. Nelson administered the [IQ] test."  In doing so, apparently the majority suggests that there is no significant distinction between Atkins' full scale IQ and that of Mackall.  In my view, our statutory mandate under Code § 17.1-313 to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases" does not, and should not, lend itself to mathematical calculations and comparisons of specific degrees of mental retardation of defendants sentenced to death.  Unlike the circumstances existing when Mackall was decided, however, the legislature, with the enactment of Code § 53.1-165.1, has effectively provided that a death sentence commuted to a life sentence shall be a life sentence without the possibility of parole.  That change in the law is a valid consideration in the

determination of whether a particular death sentence is excessive.

Moreover, it is indefensible to conclude that individuals who are mentally retarded are not to some degree less culpable for their criminal acts. By definition, such individuals have substantial limitations not shared by the general population. A moral and civilized society diminishes itself if its system of justice does not afford recognition and consideration of those limitations in a meaningful way. Such must certainly be the case when our system of justice demands, as it does, that even the mentally retarded be held responsible for criminal acts for which the legislature has determined to be properly subject to a death sentence or a sentence of life without the possibility of parole. The choice is clear and limited. In my view, the execution of a mentally retarded individual rather than the imposition of a sentence of life without the possibility of parole is excessive. I would not permit such a result in Atkins' case even though his crime was vile and his guilt undeniable. For these reasons, I respectfully dissent.