680 S.E.2d 312

Dustin Allen TURNER, Petitioner,

v.

COMMONWEALTH of Virginia, Respondent.

Record No. 1836–07–1.

Court of Appeals of Virginia.

Aug. 4, 2009.

David B. Hargett (Hargett Law, PLC, on brief), Glen Allen, for petitioner.

Robert H. Anderson, III, Senior Assistant Attorney General (Robert F. McDonnell, Attorney General, on brief), for respondent.

Before ELDER and POWELL, JJ., and COLEMAN, Senior Judge.

Dustin Allen Turner (Turner) petitions this Court for a Writ of Actual Innocence Based Upon Non-biological Evidence pursuant to Chapter 19.3 of Title 19.2 of the Code of Virginia. Turner was convicted of the abduction with intent to defile and murder of Jennifer L. Evans in the Circuit Court of the City of Virginia Beach on September 5, 1996. In a prior proceeding, Billy Joe Brown was convicted of these same crimes, as well as attempted rape. In 2002, Brown gave a taped interview in which he confessed to acting alone in killing Evans. Brown signed an affidavit in 2003 memorializing his statements from the taped interview. Based on Brown's new confession, Turner claims he is innocent of the offenses for which he was convicted.

Upon consideration of Turner's petition, the Attorney General's motion to dismiss, Turner's reply thereto, and the record, this Court remanded the matter to the circuit court to certify findings of fact regarding factual issues in dispute. The circuit court conducted a hearing in this matter and supplied this Court with its certified findings of fact, including its finding that Brown was "credible in his assertion that he acted independently in murdering the victim and that ... Turner played no role in the murder or in the restraining of the victim." Applying the mandatory statutory standard to these findings and the non-conflicting evidence adduced at Turner's trial, we conclude no rational trier of fact could have found Turner guilty of murder or abduction with intent to defile. While Turner's conduct creates a suspicion of guilt, the evidence, viewed in the context of Brown's recantation, cannot support findings of guilt beyond a reasonable doubt. We

therefore grant petitioner's request for a writ of actual innocence, vacate his convictions for murder and abduction with intent to defile, find him guilty of being an accessory after the fact, and remand the matter to the circuit court with instructions to modify the order of conviction accordingly, pursuant to Code § 19.2–327.13.

## I.

## BACKGROUND

### A.

### FACTS ADDUCED AT TRIAL

On June 18, 1995, while vacationing in Virginia Beach, Evans and two friends, Andria Burdette and Michelle McCammon, drove to a local nightclub called the Bayou. Turner and Brown, Navy SEAL trainees at the time, were also at the Bayou during a break in their training. Evans noticed Turner, whom she had not previously met, and the two struck up a conversation. Throughout the night, Evans alternated between talking with her friends and socializing with Turner. She briefly met Brown, but did not have a sustained conversation with him. From all appearances, Evans and Turner were getting along very well. Throughout the night, Brown drank considerable amounts of alcohol until he was on the verge of losing consciousness.

Around midnight, Burdette wanted to leave, but Evans expressed her desire to stay in order to continue talking with Turner. At 1:00 a.m., Evans agreed to leave with her friends and wrote her telephone number on a napkin that she gave to Turner. Burdette and McCammon went to the restroom before leaving and returned to find Turner sitting in a chair with Evans sitting on the armrest.

Burdette and McCammon left the club with Turner and Evans trailing behind. Burdette, McCammon, and Evans entered their vehicle, and Turner leaned against the back door to continue talking to Evans through the open window. Tur-

ner expressed his desire to continue socializing with Evans, and Burdette and McCammon eventually agreed to leave Evans at the club and return at 2:00 a.m. to take her home. Evans appeared happy with this arrangement and got out of the vehicle to return to the club with Turner.

Kristen Bishop, an ex-girlfriend of Brown, testified that she saw Turner and Brown at the club on June 18. She briefly socialized with Brown before leaving to go to another club. When she returned to the Bayou, she noticed Turner talking to Evans and her friends. At approximately 1:15 a.m., Turner approached Bishop and asked her to give Brown a ride home if he was not back by 2:00 a.m. Bishop reluctantly agreed. Between 1:25 and 1:30 a.m., the lights came on, announcing last call. At approximately 1:35 a.m., Bishop saw Turner and Evans leave the club holding hands. At approximately 1:45 a.m., Bishop told Brown she would give him a ride home but they had to first wait for Bishop's friend to return. Brown, who was noticeably intoxicated by this point, did not agree to this arrangement and left the club to find Turner. Bishop caught up with Brown in the parking lot and agreed to wait to make sure he had found Turner before leaving. Bishop did not see Brown again after this conversation and left a few minutes later.

Julio Fitzgibbons, a Navy SEAL commander, testified that he first met Turner and Brown at the Bayou on June 18. He talked briefly with them regarding the SEAL training process. He next met up with Turner at last call when the lights came on. He approached Turner to find out what he was doing that night after leaving the bar. Turner responded "that him and Brown ... were going to have a threesome." Brown was standing nearby as Turner made this remark. Evans approached Turner at this point, and he introduced her to Fitzgibbons. As Evans and Turner left, Fitzgibbons "gave him a thumbs up for good-bye and left." Turner responded by giving Fitzgibbons a "thumbs up" and smiling.

Officer K.C. Reilly was assigned to patrol the parking lot and general area surrounding the clubs to detect illegal activi-

ty, including underage drinking, fighting, and public urination. At 1:24 a.m., Reilly left his vehicle to inspect the parking lot on foot for suspicious activity, specifically people lingering in their vehicles. Reilly did not make any arrests for illegal activity and signed back into his vehicle at 1:51 a.m. Bruce Moore also testified in his capacity as a contract security officer for the nearby hotel. He conducted a similar patrol of the parking lot and encountered no suspicious activity.

Burdette and McCammon returned to the club at approximately 1:50 a.m., but Evans was not in the parking lot where she had promised to meet them. They searched for several hours but could not find Evans. They filed a missing persons report with the police the next day. Bishop read about Evans' disappearance and contacted the authorities with the information she had regarding seeing Evans with Turner and Brown on the night of her disappearance.

The authorities interviewed Turner and Brown on multiple occasions in the subsequent week. Turner initially denied leaving the club with Evans but eventually agreed to lead the authorities to her body. He told the police that Brown choked Evans to death in his vehicle while they sat in the parking lot of the Bayou. When confronted with Turner's confession, Brown accused Turner of murdering Evans.

Both men were indicted for various crimes related to Evans' death. Brown was tried first in June 1996. He chose to take the stand and testified that he did not want to receive a ride back to the military base from Bishop, so he went outside to look for Turner. According to Brown, Turner leapt out of the vehicle as Brown approached and ordered him to get in. Brown testified, under oath, that Turner stated he had killed Evans in the vehicle and that it was solely Turner's idea to defile and dispose of Evans' body. Brown was subsequently convicted of abduction with intent to defile, attempted rape, and murder.

Turner's trial began in August 1996. Charlotte Lowe, the forensic supervisor who analyzed the crime scene, testified that Evans' body was in an advanced state of decomposition

and skeletalization, such that many of the bones were exposed. Evans' vest had been pulled back around the shoulders and over the chest, and her bra was pushed up, exposing her breasts. Her shorts and underwear had been pulled down so that they were attached to only one leg. Lowe also examined Turner's car for semen, urine, fingerprints, and other physical evidence, but could not find anything of forensic value in the car.

Dr. Leah Bush performed the autopsy on Evans' body and confirmed that the rate of decomposition was significantly accelerated by the heat and outdoor conditions. In her expert opinion, it was impossible to determine the exact cause of death due to the severe skeletalization, but manual strangulation was a possibility. Dr. Bush described the various chokeholds that could lead to death. Specifically, she said the carotid sleeper hold, commonly performed by squeezing the neck, causes death within three to five minutes by restricting blood flow to the brain. She also testified that the bar-arm chokehold—in which the assailant presses a solid object, such as a police baton or a forearm, against the windpipe—could cause death in less than a minute due to the heightened risk of crushing the airway. Dr. Bush further explained that bracing the victim's head against a solid object could assist an assailant in performing the bar-arm chokehold.

Dr. Bush conclusively ruled out a broken neck as a cause of death because the spinal cord did not show signs of fracture. Significant to Dr. Bush's conclusion was that the headrest in the car would have greatly hindered hyperextension of the neck. While she acknowledged that she relied only on x-rays of Evans' neck to form her conclusions, Dr. Bush stated that an extensive autopsy was unnecessary due to the decomposition fully exposing the spinal cord.

Todd Ehrlich testified as to Turner and Brown's reputation for engaging in group sex. Specifically, he recalled seeing the two men socializing with two women on June 16 while stationed at Fort AP Hill, Virginia. According to Ehrlich, Turner alternated between talking to one of the young women and

then talking to Brown to give him a "progress report." He could not recall the specifics of the conversation but said it involved Turner and Brown attempting to get the young woman to go home with them. Ehrlich testified that the two women left together without Turner and Brown, and Turner did not follow them or attempt to restrain them in any way. Ehrlich further recalled a conversation he had with Turner and Brown regarding group sex while stationed in California. Specifically, Ehrlich claimed to have witnessed Turner and Brown engage in group sex with a woman and later heard them brag about the incident. Ehrlich affirmed that there was no indication that the incident of group sex occurred against the woman's will.

Turner testified in his own defense and asserted that he never intended to have sex with Evans. According to Turner, his original plan was to take Evans to the beach to continue talking, but he abandoned that idea because it would have been impossible to do so and still return by 2:00 a.m. to meet Evans' friends. Instead, Turner testified that he and Evans went to his vehicle to wait there for Burdette and McCammon to return.

While waiting, Turner saw Brown approach and told Evans to "pay no attention to this guy. He's drunk. Don't believe a word he says." Brown then entered the vehicle and sat in the back seat directly behind Evans. He began cursing and making belligerent remarks towards Turner and Bishop. Turner testified that he could not remember details, but he recalled that Brown shifted his attention towards Evans and began making crude remarks to her. Out of the corner of his eye, Turner saw Brown touch Evans, and she slapped his hand away. At that moment, Turner saw Brown reach around and make a jerking motion with both arms. From Turner's description, Brown had both arms locked around Evans' neck and was making a squeezing motion. Turner tried to pry Brown's arms from her neck but could not. After a minute, Brown let go and Turner checked Evans' vital signs, but he could not find a pulse. Brown yelled at Turner to drive, and he complied.

As Turner drove away, Brown reached beneath Evans' shorts until Turner yelled at him to stop. Brown then passed out. Turner drove to a secluded area near some woods where he and Brown took Evans' body out of the vehicle. Turner went back to the vehicle to look for a shovel, and when he returned, he found Brown lying on top of Evans' body. Turner pulled Brown off, and Brown said, "It doesn't matter because I couldn't get it—a hard on anyway." They drove off after covering Evans' body with leaves, ate at a diner, and then returned to the military base. The next day, Turner and Brown woke up and signed a lease to be roommates for the next year.

Responding to Ehrlich's testimony regarding the incident of group sex in California, Turner stated that "it all center[ed] around one incident and bragging about that one incident." He confirmed talking to Fitzgibbons on the night of June 18, but he denied talking about engaging in a threesome with Brown. Turner reiterated that he "did not actively try to sleep with [Evans,]" and that "she wasn't that type of girl at all."

On September 5, 1996, the jury found Turner guilty of abduction with intent to defile, in violation of Code § 18.2–48, and murder, in violation of Code § 18.2–32. The trial court imposed a prison sentence of 82 years. Both this Court and the Virginia Supreme Court denied Turner's petitions for appeal.

## B.

## BROWN'S RECANTATION

On July 2, 2002, Brown, who did not testify at Turner's trial, provided a tape-recorded interview in which he stated he had lied to investigators about Turner's involvement in Evans' death and testified falsely about those events at his own trial. Brown admitted in the interview that he spontaneously choked Evans and then blamed Turner because Turner had betrayed him by telling investigators what happened and where Evans' body was hidden. On February 28, 2003, Brown signed an

affidavit that memorialized this interview. Turner then filed in this Court a petition for a writ of actual innocence based upon newly-discovered, non-biological evidence. In his petition, Turner relied upon Brown's 2002 admission and 2003 affidavit in which Brown stated that he alone killed Evans and that Turner played no part in it. Turner averred that other evidence in the record supported Brown's statement absolving Turner. The Commonwealth filed a motion to dismiss Turner's petition, alleging that the petition was without merit because Brown's confession was not credible and because even if it was credible, the other evidence against Turner was sufficient to find him guilty either as a principal in the second degree or under the felony-murder doctrine.

Pursuant to Code § 19.2–327.12, this Court ordered the circuit court to conduct an evidentiary hearing and to make factual findings as to four certified questions:

1) whether Brown's recanted testimony is credible in his assertion that he testified falsely at his own trial;

2) if the answer to Question # 1 is "yes," did Brown testify falsely as to any material fact;

3) if the answer to Question # 1 is "yes," was Brown's recantation testimony unknown or unavailable to the petitioner or his counsel at the time the conviction became final, or could such recantation testimony, through the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction; and

4) is Brown credible in his assertion that he acted independently in murdering the victim and that Turner had no role in the murder or any restraint of the victim? [1]

On May 28, 2008, the circuit court conducted an evidentiary hearing. Brown testified that on the night of June 18, he did not want to engage in sexual intercourse and purposefully consumed excessive amounts of alcohol. He recalled briefly

---

1. This Court posed the fourth question to the circuit court upon motion by Turner.

talking to Evans and claimed he did not know Turner's intentions concerning Evans aside from his wanting to spend more time with her. Brown confirmed Turner's prior testimony that Bishop was to give Brown a ride home but that he did not want to wait for Bishop's friend to arrive. Brown admitted that, by this point, he was on the verge of passing out due to intoxication. He found Turner's vehicle and climbed into the back seat behind Evans. Brown recalled saying something vulgar, but could not remember specifically what he said. Brown testified that "one minute [he] was normal and the next minute [he] snapped and [he] started choking [Evans,]" by putting his left arm against her neck and holding it with his right arm. He recalled that Evans' head was up against the headrest.

Brown confirmed telling Turner to drive. He further admitted to pulling Evans' vest off and then pulling her pants down before passing out. Brown also confirmed he attempted to have sex with Evans' body after he and Turner placed it in the woods.

Brown acknowledged having given conflicting accounts of how the murder occurred. He admitted that he lied to the police and repeated the lie at his own trial. He explained that he fabricated Turner's involvement in the murder because he was angry with Turner for telling the police where Evans' body was located. He stated that at the time, he perceived no difference between telling one lie and telling several lies. In explaining his recent recantation, Brown clarified that his conversion to Christianity was the main reason for his coming forward. Brown stated that so long as he truthfully confessed to what had happened that night, he did not care whether his testimony would help exonerate Turner.

Upon considering the testimony from the evidentiary hearing and the transcripts from the original trials of Turner and Brown, the circuit court found that Brown "is credible in his assertion that he testified falsely at his own trial," that Brown "testified falsely as to a material fact in the case," that "Brown's recantation of his earlier testimony was unknown

and unavailable to the petitioner in this proceeding ... at the time of his conviction and at the time his conviction became final," and that Brown "is credible in his assertion that he acted independently in murdering the victim and that ... Turner played no role in the murder or in the restraining of the victim."

## II.

## ANALYSIS

### A.

### STANDARD OF REVIEW

Code § 19.2–327.10 confers original jurisdiction upon the Court of Appeals of Virginia to consider a petition for a writ of actual innocence based on newly-discovered, non-biological evidence filed by any individual "convicted of a felony upon a plea of not guilty." *See also Carpitcher v. Commonwealth,* 273 Va. 335, 342, 641 S.E.2d 486, 490 (2007). "The writ shall lie to the court that entered the conviction...." Code § 19.2–327.10.

To obtain a writ of actual innocence, a petitioner must allege, *inter alia,* that the newly-discovered evidence

(1) "was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction became final in the circuit court," Code § 19.2–327.11(A)(iv);

(2) "is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction by the court," Code § 19.2–327.11(A)(vi);

(3) "is material and when considered with all of the other evidence in the current record, will prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt," Code § 19.2–327.11(A)(vii); and

(4) "is not merely cumulative, corroborative or collateral," Code § 19.2–327.11(A)(viii).

*Carpitcher*, 273 Va. at 343–44, 641 S.E.2d at 491. The parties agree that the newly-discovered, non-biological evidence at issue in this case is Brown's confession—given six years after Turner's conviction—that he alone killed Evans. Of the four elements listed above, only the third is at issue in this case: Whether Turner has carried his burden of proving, by clear and convincing evidence, (a) that Brown's new confession is "material" and (b) that, when considering Brown's confession with all the other evidence in the current record, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." [2] Code §§ 19.2–327.11(A)(vii), –327.13.

In analyzing Turner's petition, we must first determine whether Brown's statement is "material." In order to be "material" within the meaning of Code § 19.2–327.11(A)(vii), "evidence supporting a petition for a writ of actual innocence based on non-biological evidence must be true." *Carpitcher*, 273 Va. at 345, 641 S.E.2d at 492. If the circuit court cannot determine whether the original testimony, the recantation testimony, or some other version of events is true, the petitioner has not met his burden of proving materiality because "the General Assembly intended to provide relief only to those individuals who can establish that they did not, as a matter of fact, commit the crime for which they were convicted" and not to those "who merely produce evidence contrary to the evidence presented at their criminal trial." *Id.* "Because the Court of Appeals cannot hold its own evidentiary hearing to assess a witness' credibility, but must ultimately determine whether a recantation is true, Code § 19.2–327.12 provides a

---

**2.** This confession qualifies as a recantation because it unequivocally repudiates the version of events implicating Turner that Brown gave both to investigators around the time of his arrest in 1995 and under oath at his own trial in 1996. *See Black's Law Dictionary* 1295 (8th ed. 2004) (defining the term "recant" as "[t]o withdraw or renounce *prior statements* or testimony formally or publicly" (emphasis added)). It is irrelevant that Brown did not testify at Turner's trial, especially in light of the sworn testimony Brown had just given at his own trial, which clearly demonstrated Brown's intent to incriminate Turner. Brown's recantation testimony was unavailable at the time of Turner's original trial, and the Commonwealth does not contend otherwise.

mechanism to assist the Court of Appeals in this task." *Johnson v. Commonwealth,* 273 Va. 315, 322, 641 S.E.2d 480, 484 (2007). Pursuant to that code section,

> If the Court of Appeals determines ... that a resolution of the case *requires* further development of the facts, the court may order the circuit court in which the order of conviction was originally entered to conduct a hearing ... to certify findings of fact with respect to such issues as the Court of Appeals shall direct.

Code § 19.2–327.12 (emphasis added). "The statute does not place any restrictions on the subject matter of such referral orders." *Johnson,* 273 Va. at 322, 641 S.E.2d at 484.

■ Before determining whether further factual development is required, this Court should determine whether the recantation, if believed, will "prove that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Code § 19.2–327.11(A)(vii). If, assuming the recantation is found to be credible by the circuit court, a rational trier of fact could still conclude all the evidence proves guilt beyond a reasonable doubt, then a referral to the circuit court for determining the credibility of the recantation is not *"require[d]"* under Code § 19.2–327.12. (Emphasis added). If this Court orders the circuit court to evaluate the credibility of the recantation, however, the holding in *Carpitcher* applies, and the circuit court's determination of the credibility of the recantation testimony is binding in this Court. *Carpitcher,* 273 Va. at 342–43, 641 S.E.2d at 490.

In order to determine the credibility of Brown's statement, we ordered the circuit court in which the order of conviction was originally entered to conduct a hearing on the credibility of Brown's recantation testimony and issue certified findings of fact. *See* Code § 19.2–327.12; *see also Johnson,* 273 Va. at 322–23, 641 S.E.2d at 484 (involving a referral of the recantation of a co-defendant, which the circuit court found was not credible). After conducting an evidentiary hearing, as well as reviewing in detail the evidence that was presented in the prior trials of both Brown and Turner, the circuit court

expressly found Brown credible both in his assertion that he testified falsely to a "material" fact at his own trial and in his present statement that "he acted independently in murdering [Evans] and that Turner played no role in the murder or any restraint of the victim."

The Commonwealth asserts that this Court owes no deference to the factual findings of the circuit court. Much like a criminal trial does not incorporate the findings of fact adduced in a preliminary hearing unless specifically agreed to by the parties, the Commonwealth urges this Court to disregard the factual findings adduced in an evidentiary hearing pursuant to Code § 19.2–327.12. This approach is contrary to the statutory standard of review and is unsupported by any controlling or persuasive authority.

■ In explaining how the "factual findings certified by the circuit court in response to the Court of Appeals' order referring certain factual issues pursuant to Code § 19.2–327.12" should be treated by Virginia's appellate courts, the Supreme Court clarified that "[s]uch factual findings are similar to circuit court findings made under Code § 8.01–654(C) in habeas corpus cases in which [the Supreme Court] ha[s] original jurisdiction and ha[s] referred certain factual issues to the circuit court for an evidentiary hearing." *Carpitcher*, 273 Va. at 342–43, 641 S.E.2d at 490 (citations omitted). In habeas corpus cases, "[t]he circuit court's factual findings ... are entitled to deference and are binding upon [the Supreme] Court unless plainly wrong or without evidence to support them." *Hedrick v. Warden of the Sussex I State Prison*, 264 Va. 486, 496, 570 S.E.2d 840, 847 (2002). We adhere to the familiar principles giving deference to factual findings as enunciated in *Carpitcher*.

The Commonwealth's argument that Brown's account defies the medical evidence does not persuade us that the circuit court's findings were plainly wrong because such a view ignores significant portions of the medical expert's testimony. Dr. Bush could not conclusively determine the cause of death and described multiple scenarios that could explain how Evans

died. *See* Code § 19.2–327.11(A)(vii) (directing this Court to "consider[ ] . . . *all of the other evidence* in the current record" when determining whether a petitioner has met his statutory burden (emphasis added)). Indeed, Brown's version of Evans' death aligns with Dr. Bush's opinion regarding the bar-arm chokehold. It is entirely plausible that Brown used his left forearm to crush Evans' airway, thereby restricting both the oxygen and blood flow to cause a quick death, especially considering that Brown weighed over 200 pounds and was fit to endure the rigorous training regimen of a Navy SEAL.

■ We also reject the Commonwealth's contention that the circuit court's factual findings were fatally incomplete and conclusory. On referral to the circuit court for factual findings,

> There is no mandatory formula for a circuit court's consideration of the credibility of a particular witness. As the trier of fact, the circuit court is charged with the responsibility of considering various factors, including the witness' demeanor, his opportunity for knowing the things about which he testified, his bias, and any prior inconsistent statements relating to the subject of his present testimony. In addition, the circumstances of a particular case may raise other factors that the circuit court deems relevant in assessing a witness' credibility.

*Johnson,* 273 Va. at 323, 641 S.E.2d at 485 (citations omitted).

Here, the circuit court clearly answered, albeit briefly, the four questions ordered from this Court and thus fulfilled its obligations under Code § 19.2–327.12. Having fully considered the record in this case, we cannot say that the circuit court's factual findings are plainly wrong or without evidence to support them and, therefore, we are bound by these findings.

## B.

### TURNER'S PARTICIPATION IN THE CRIMES

■ Next, we must consider whether Brown's credible confession, "when considered with all of the other evidence in the

current record, ... prove[s] that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Code § 19.2–327.11(A)(vii). Turner was convicted of abduction with intent to defile, in violation of Code § 18.2–48, and murder, in violation of Code § 18.2–32, under the felony-murder doctrine. Thus, not only must Brown's recantation negate Turner's participation in killing Evans, but it must also sever the causal connection between his conduct and the underlying crime that gave rise to the murder.

Turner argues that we cannot arbitrarily disregard Brown's recantation and that all other evidence must be viewed in the context of Brown's assuming sole responsibility for the murder. To that end, Turner asserts that the Commonwealth's evidence is merely circumstantial and does not exclude the reasonable hypothesis of innocence that Brown acted independently in murdering Evans and that Turner had no role in the murder or restraint of Evans.

In opposition, the Commonwealth contends that a rational trier of fact could conclude Brown's recantation is unreliable and, thus, Turner has failed to carry his statutory burden.[3] Alternatively, the Commonwealth argues that Brown's recantation cannot be reconciled with the evidence established at Turner's trial. Fitzgibbons' testimony, according to the Commonwealth, demonstrates Turner's intent to engage in group sex with Brown and Evans, which presumably supports the conclusion that the two men acted in concert to abduct Evans with the intent to defile her.

---

**3.** As explained above, this credibility determination is not plainly wrong and has been approved by this Court in its entirety. *See supra* Part II.A. Thus, the hypothetical "rational trier of fact" posited by Code § 19.2–327.11(A)(vii) may not reassess the credibility of the recantation testimony and must accept this testimony as true. *See Commonwealth v. Jackson*, 276 Va. 184, 196, 661 S.E.2d 810, 816 (2008); *Blount v. Commonwealth*, 213 Va. 807, 809, 195 S.E.2d 693, 695 (1973). We must view the whole record within the context of Brown's recantation, already found to be credible by the circuit court, to determine whether Turner has met his statutory burden. *See* Code § 19.2–327.11(A)(vii). To disregard the circuit court's credibility determination would render the entire evidentiary hearing meaningless.

■ A defendant is guilty of first-degree murder under Code § 18.2–32 where the killing occurs "in the commission of, or attempt to commit, arson, rape, forcible sodomy, inanimate or animate sexual penetration, robbery, burglary or abduction." The statute codifies the common law doctrine of felony murder and "elevate[s] to murder a homicide committed during the course of a felony by imputing malice to the killing." *King v. Commonwealth,* 6 Va.App. 351, 354, 368 S.E.2d 704, 705 (1988).

■ Where two or more parties engage in criminal concert of action, one who participates in the initial felony giving rise to the homicide may be found guilty of murder whether or not he was the one who actually dealt the killing stroke. *See Rollston v. Commonwealth,* 11 Va.App. 535, 543, 399 S.E.2d 823, 828 (1991) (recognizing the application of concert of action in felony-murder cases); *see also Wooden v. Commonwealth,* 222 Va. 758, 762, 284 S.E.2d 811, 814 (1981); *Berkeley v. Commonwealth,* 19 Va.App. 279, 286–87, 451 S.E.2d 41, 45 (1994) (holding that the victim's death resulted from her abduction so that the defendant's participation in the continuing transaction provided sufficient evidence to affirm his conviction of first-degree murder). "Concerted action is defined as '[a]ction that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme.'" *Rollston,* 11 Va.App. at 542, 399 S.E.2d at 827 (quoting *Black's Law Dictionary* 262 (5th ed. 1979)).

■ "[W]hen the homicide is within the *res gestae* of the initial felony and is an emanation thereof, it is committed in the perpetration of that felony." *King,* 6 Va.App. at 354, 368 S.E.2d at 705 (1988). Our courts have interpreted this concept to prohibit application of the felony-murder doctrine where the killing merely coincided with the underlying felony and was not a consequence thereof. *See id.* at 356, 368 S.E.2d at 707 (citing *Commonwealth v. Redline,* 391 Pa. 486, 137 A.2d 472, 476 (1958)); *see also Griffin v. Commonwealth,* 33 Va. App. 413, 425, 533 S.E.2d 653, 659 (2000) (requiring evidence

that the killing "resulted from an act which was an *integral* part of the felony or an act in *direct* furtherance of or *necessitated* by the felony" (emphasis added)).

The underlying crime used to support Turner's conviction for felony murder is abduction with intent to defile. "Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such other person of his personal liberty ... shall be guilty of 'abduction.'" Code § 18.2–47. Code § 18.2–48 provides an enhanced penalty "for the abduction of any person with intent to defile such person."

As a result of Turner's petition for a writ of actual innocence, this Court ordered the circuit court to make factual findings on four questions, only one of which related directly to the specific offenses for which Turner had been convicted, murder and abduction with intent to defile: "4) [I]s Brown credible in his assertion that he acted independently in murdering the victim and that Turner had no role in the murder or *any* restraint of the victim?" (Emphasis added). In response to that question, the circuit court determined Brown was "credible in his assertion that he acted independently in murdering the victim and that ... Turner played no role in the murder *or* in the restraining of the victim." (Emphasis added).

 Both the question and answer must be viewed in the context of the convictions Turner challenges—for murder and abduction with intent to defile. The circuit court, by referring to the murder and the restraint in the disjunctive, contemplated Brown's recantation in light of both the actual killing and the underlying crime of abduction. "Restrain" means " '[t]o control' " or " '[t]o take away freedom or liberty of.' " *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (quoting *Webster's Second New Riverside University Dictionary* (1984)); *see also Black's Law Dictionary* 1340 (8th ed. 2004) (defining "restraint" as "[c]onfinement," "limitation," or "[p]rohibition of action"). The legislature has provided that

abduction as defined in Code § 18.2–47 is synonymous with kidnapping, *see* Code § 18.2–47(C), which is not separately defined in the Virginia Code. At common law, kidnapping required proof of both "an unlawful restraint" and an asportation. *See State v. Dix,* 282 N.C. 490, 193 S.E.2d 897, 899 (1973). Although our legislature, like many others, now permits a conviction for abduction upon proof of a detention without any asportation, *see, e.g., Scott v. Commonwealth,* 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984), the statutory language provides no indication the legislature has removed the "restraint" requirement. To the contrary, one who "seizes, takes, transports, detains or secretes the person of another," as those terms are used in Code § 18.2–47, "restrains" that person under the accepted legal definition of the term. The Supreme Court has recognized that a conviction for abduction under Code § 18.2–47 requires proof of restraint of the victim either by asportation or detention and that the asportation or detention may be accomplished by force, intimidation or deception. *Jerman v. Dir. of the Dep't of Corr.,* 267 Va. 432, 439, 593 S.E.2d 255, 259 (2004); *see* John L. Costello, *Virginia Criminal Law and Procedure* § 5.1[6] (2009) ("[A]bduction consists of *restraints* on the personal liberty of another." (Emphasis added)). Thus, an asportation by force or deception is a type of restraint [4] and, if the other statutory elements

---

4. Other states have incorporated such definitions into their statutes. *See, e.g., State v. Wilcox,* 254 Conn. 441, 758 A.2d 824, 838 (2000) (noting that Conn. Gen.Stat. § 53a–91 requires proof of restraint to support a conviction of abduction and defines " 'restrain' ... as 'restricting a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty [either (1)] by moving him from one place to another [asportation], or [(2)] by confining him either in the place where the restriction commences or in a place to which he has been moved [detention], without consent' "); *People v. Valero,* 134 A.D.2d 635, 521 N.Y.S.2d 527, 528 (N.Y.App.Div. 1987) (holding an abduction is a "serious form of restraint" under New York law); *Romero v. State,* 34 S.W.3d 323, 325 (Tex.App.2000) (noting that under Tex. Pen.Code Ann. § 20.01 abduction requires proof of restraint, which means "to restrict a person's movements without consent, so as to interfere substantially with her liberty, [ (1) ] by moving her from one place to another [asportation] or [ (2) ] by confining her [detention]").

are proved, constitutes an abduction in violation of Code § 18.2–47.

Based on the crimes for which Turner was convicted, the wording of the question posed by this Court to the circuit court, and the accepted "assum[ption] that trial judges have knowledge of the Commonwealth's laws and properly apply those laws" absent clear evidence to the contrary, *Wilson v. Commonwealth*, 23 Va.App. 318, 326 477 S.E.2d 7, 10 (1996), we conclude the circuit court's use of the word "restraint" constitutes a finding that Turner did not participate with Brown in an abduction by either force or deception. The circuit court's ruling therefore compels a rejection of the theory that Turner and Brown engaged in any criminal concert of action and prevents a finding that any causal connection existed between Turner's conduct and Evans' death.

In light of the circuit court's acceptance of Brown's testimony that Turner did not participate in the murder or the abduction leading to the murder, the record affirmatively proves no agreement between Turner and Brown existed to undertake these acts.[5] In the absence of such an agreement, no rational trier of fact could find the men acted in concert to abduct or kill Evans. Because the two men each acted of their own volition, Turner's conduct and Brown's entry into the vehicle and subsequent killing were not "interdependent objects of a common criminal design." *Edmonds v. Commonwealth*, 229 Va. 303, 310, 329 S.E.2d 807, 813 (1985). Indeed, Turner's waiting with Evans in his vehicle merely accounted for his "presence at the location of the [murder], and nothing directly related to the commission of the felony that caused the [murder]." *King*, 6 Va.App. at 358, 368 S.E.2d at 708 (finding no causal connection between flying a plane contain-

5. As the circuit court noted, the evidence establishing Turner's guilt was largely circumstantial. Brown did not testify at Turner's trial and did not provide his false inculpatory testimony to the jury. All of the Commonwealth's eyewitness testimony confirmed that Evans was last seen with Turner on the night of her death, a fact Turner readily concedes. There are, however, no eyewitnesses—besides the two convicted men—who identified the actual killer.

ing marijuana as part of a drug smuggling operation and the death of a co-felon caused by crashing the plane into a mountain); *see Rollston,* 11 Va.App. at 542, 399 S.E.2d at 827 ("Mere presence during the commission of a crime is not sufficient to render one criminally liable."). Whatever intentions Turner possessed when he left the club with Evans, he did not act in concert with Brown to lure her into leaving the club for the purpose of engaging in sexual intercourse against her will. Instead, Brown, acted as an independent and superseding force so that his actions constituted a separate—and completely coincidental—enterprise with no causal connection to Turner's own conduct.

While Brown's recantation has severed Turner from the criminal enterprise leading to Evans' murder, we must still answer the question whether, in light of the circuit court's acceptance of Brown's recantation, a rational trier of fact could have concluded beyond a reasonable doubt that Turner abducted Evans with intent to defile prior to and separate from Brown's acts of restraint and murder.

Under Code § 18.2–47, abduction requires proof of an asportation or detention. *See Scott,* 228 Va. at 526, 323 S.E.2d at 576. The accused need not have used any actual force or restraint against the victim in order to sustain a conviction. *Kent v. Commonwealth,* 165 Va. 840, 841–42, 183 S.E. 177, 177–78 (1936). Instead, restraint for purposes of abduction includes a taking away or detention induced by fraud or deception. *See* Code § 18.2–47; *Jerman,* 267 Va. at 439, 593 S.E.2d at 259; *Kent,* 165 Va. at 841–42, 183 S.E. at 177–78; Costello, *supra,* § 5.1[6]. However, the evidence must show that the accused effected such deception with the specific intent to defile the victim. *See Johnson v. Commonwealth* (*Johnson II* ), 221 Va. 872, 879, 275 S.E.2d 592, 597 (1981); *see also Simms v. Commonwealth,* 2 Va.App. 614, 617, 346 S.E.2d 734, 735 (1986) (equating "defile" with "sexually molest"). Unless the victim is legally unable to consent due to age or infirmity, an allegation not advanced in this case, the intent-to-defile element requires proof of an intent to engage in sexual

contact against the will of the claimed victim. *See, e.g.,* Code §§ 18.2–61 (rape), –67.1 (forcible sodomy), –67.3 (aggravated sexual battery), –67.4 (sexual battery).

 " 'Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case.' " *Hughes v. Commonwealth,* 18 Va.App. 510, 519, 446 S.E.2d 451, 457 (1994) (quoting *David v. Commonwealth,* 2 Va.App. 1, 3, 340 S.E.2d 576, 577 (1986)). The state of mind of an accused may be shown by his conduct and by his statements. *Long v. Commonwealth,* 8 Va.App. 194, 198, 379 S.E.2d 473, 476 (1989). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided [the evidence as a whole] is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Coleman v. Commonwealth,* 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). In its role of judging witness credibility, the fact finder is entitled to disbelieve, in whole or in part, the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt. *Speight v. Commonwealth,* 4 Va.App. 83, 88, 354 S.E.2d 95, 98 (1987) (en banc). The rejection of that testimony, however, does not provide substantive evidence that the opposite is true. *Tarpley v. Commonwealth,* 261 Va. 251, 256–57, 542 S.E.2d 761, 764 (2001).

In *Jerman,* 267 Va. 432, 593 S.E.2d 255 (2004), the defendant argued that the detentions were merely incidental to the assault and murder of the victim. The Supreme Court of Virginia disagreed, holding that the abductions were distinct from the assault and that one of the abductions was accomplished through asportation by deception. *Id.* at 439, 593 S.E.2d at 259. Specifically, the defendant's co-conspirator drove the victim, a drug dealer, to her house for the stated purpose of purchasing drugs for some of her friends. Instead, her actual purpose was to lure the victim to the house for the purpose of confronting him about an earlier drug transaction. The Court held that this conduct proved the defendant com-

mitted abduction by deception as a principal in the second degree. *Id.* at 440, 593 S.E.2d at 260.

Similarly in *Kent,* 165 Va. 840, 183 S.E. 177 (1936), the defendant kidnapped the victim with intent to extort money for pecuniary benefit. The evidence showed that the defendant induced the victim to accompany him to Washington, D.C., on the assurance that he would obtain money to satisfy a debt he owed her. *Id.* at 842, 183 S.E. at 177–78. The victim was found murdered shortly after accepting the defendant's invitation. The evidence further demonstrated that the defendant would have benefited financially upon the victim's death. The Court held that "such circumstances amounted to fraud and coercion on [the defendant's] part and for the purpose of pecuniary benefit. . . ." *Id.* at 842, 183 S.E. at 178.

In both *Kent* and *Jerman,* the Court determined that the abductions occurred when the defendants told a specific lie that induced or coerced their respective victims into going places they would not otherwise have gone. In this case, by contrast, the evidence is insufficient to support a finding beyond a reasonable doubt that Turner made any statement or engaged in any act showing an intent to deceive Evans for the purpose of sexually molesting her against her will. Although the evidence does not preclude the *possibility* that Turner had such an intent, reasonable hypotheses of innocence flow from the evidence, thereby precluding any rational trier of fact from finding Turner guilty beyond a reasonable doubt of abduction with intent to defile.

Turner's stated purpose for leaving the club with Evans was to wait with her in his vehicle for Burdette and McCammon to return. Although a rational fact finder could have rejected Turner's testimony regarding his purpose, such a rejection does not support a finding that he acted instead with the requisite criminal intent to abduct Evans with an intent to defile. *See Tarpley,* 261 Va. at 256–57, 542 S.E.2d at 764.

Fitzgibbons' testimony also does not support such a finding. According to Fitzgibbons, Turner said that he and Brown were going to engage in group sex. However, before Turner

spoke to Fitzgibbons, he had made arrangements with Bishop to take Brown home if Turner did not return to the club in time to do so himself. Further, Brown testified at the evidentiary hearing that his primary purpose that night was to drink excessively and not socialize with women.[6] This evidence supports the reasonable inference that Turner's statement to Fitzgibbons about group sex was nothing more than an allusion to a prior incident in which Turner and Brown had engaged in group sex with an unrelated, willing female participant while stationed in California. Brown was standing near Turner and Fitzgibbons at the time, and whether or not Fitzgibbons was aware of the prior incident does not negate the reasonableness of this inference.

Perhaps most importantly, even if the evidence supported a finding that Turner lied to Evans about his purpose in going with her to his car and that he actually hoped to have some form of sexual contact with her, the record contains no indication that Turner acted with the intent to have that sexual contact by force if Evans had refused. In *Johnson II*, the Supreme Court of Virginia reversed the defendant's conviction of abduction where his acts of restraint were "done in furtherance of his sexual advances and not with the intent to deprive [the victim] of her personal liberty."[7] 221 Va. at 879, 275

---

**6.** The scope of the circuit court's credibility assessment of Brown's recantation is unclear. *See Rollston*, 11 Va.App. at 547, 399 S.E.2d at 830 (permitting a fact finder to believe or disbelieve in part or in whole the testimony of any witness). However, as already discussed, the circuit court expressly found Turner "played no role" in any "restraining of the victim," and restraint can be achieved through fraud or deception. *See Wilson*, 23 Va.App. at 326, 477 S.E.2d at 10 (holding the trial court is presumed to know the law absent clear evidence to the contrary). Thus, in finding Turner had "no role . . . in the restraining of the victim," the circuit could necessarily concluded Turner and Brown had no agreement to lure Evans from the club to Turner's car to facilitate forcible sexual contact.

**7.** The defendant in *Johnson II* was charged with abduction with intent to defile, but the jury convicted him of abduction. 221 Va. at 873, 877, 275 S.E.2d at 593, 595. The Court clarified its ruling by stating that "the evidence did not support a finding that Johnson intended either to

S.E.2d at 597. In that case, the defendant followed the victim into her kitchen after knocking on her door. He grabbed the victim from behind, attempted to kiss her, and rubbed his hips against her buttocks. When the victim's landlady responded to her cries for help, the defendant released the victim and walked rapidly out of the apartment. The Court held that the defendant clearly "entered the apartment with the intention of having sexual intercourse with the [victim] and that the advances he made, however limited and fleeting, were designed to accomplish that purpose. However, his assault was frustrated by her resistance and stopped short of constituting an attempted rape." *Id.* at 879, 275 S.E.2d at 596–97. On those facts, the evidence did not prove the defendant acted with the separate intent to deprive the victim of her personal liberty with the intent to defile.

Here, the circumstantial evidence "fails 'to form an unbroken chain which links [Turner] to the crime beyond a reasonable doubt,' " *Hickson v. Commonwealth,* 258 Va. 383, 388, 520 S.E.2d 643, 645 (1999) (quoting *Bishop v. Commonwealth,* 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984)), because a rational trier of fact could find Turner acted with an intent to defile Evans only by "resorting to speculation and surmise," *Patterson v. Commonwealth,* 215 Va. 698, 699, 213 S.E.2d 752, 753 (1975). There is no evidence that Turner overbore Evans' will at any point in the night. Turner did not force Evans to stay behind; she willingly agreed to remain with him at the club and to meet her friends later during the night. Turner did not make Evans uncomfortable; to the contrary, she appeared to have enjoyed his company. Moreover, Turner's reputation for engaging in group sex is insignificant because no evidence indicates that the alleged prior group encounter was nonconsensual. The evidence of the condition in which Evans' body was found supports a finding that she had been sexually molested because her pants and underwear had been removed and her vest had been pushed up. However, Brown's recanta-

---

defile his victim or to deprive her of her personal liberty." *Scott,* 228 Va. at 525, 323 S.E.2d at 576 (footnote omitted).

tion accounts for this because he fully admitted to defiling Evans' body after he had killed her.

In light of Brown's recantation, the evidence proves beyond a reasonable doubt, at most, that when Turner invited Evans to wait in his vehicle for her friends, he did so with the hope of persuading her to have consensual sexual contact. Other than Turner's statement to Fitzgibbons about "hav[ing] a three-some," implicitly rejected by the circuit court as a basis for convicting Turner of the murder and abduction committed solely by Brown, the record was devoid of evidence supporting a finding that Turner acted with the intent to force Evans into having sex against her will. Brown's recantation negates the inculpatory evidence against Turner to such an extent that no rational trier of fact could have found him guilty beyond a reasonable doubt of abduction with intent to defile.

The dissent suggests that, notwithstanding Brown's recantation, the circumstantial evidence would allow a rational trier of fact to conclude Turner was guilty of abduction with intent to defile. In doing so, the dissent, in effect, analyzes the evidence as a typical appeal challenging the sufficiency of the evidence, in which a single fact finder, here the jury, has made all relevant factual determinations and this Court, on review, considers all the evidence in the light most favorable to the Commonwealth.[8] However, to adjudicate a petitioner's writ of actual innocence following a jury trial, we view all the evidence from the perspective of the hypothetical "rational trier of fact"

---

8. This Court, in fact, applied that standard when it denied Turner's petition for direct appeal of his convictions, concluding "[t]he totality of the Commonwealth's evidence, though circumstantial, ... was sufficient to prove beyond a reasonable doubt that appellant was guilty of abduction and murder" as a principal in the first or second degree. *Turner v. Commonwealth*, No. 0381–97–1 (Va.Ct.App. Sept. 24, 1997) (order of denial on one-judge review); *see Turner v. Commonwealth*, No. 0381–97–1 (Va.Ct.App. Jan. 23, 1998) (order of three-judge panel adopting the reasoning of the one-judge denial order). Had Brown's recantation been introduced at Turner's original trial, the jury would have been free to assess Brown's credibility in conjunction with all the evidence, and the dissent's reasoning in the present proceeding would have supported an affirmance of Turner's convictions in that direct appeal.

because we must take into account the impact of the evidence adduced at a subsequent proceeding, the credibility of which has been determined by a different fact finder, the circuit court. Without the aid of a singular point of view, we must supplant the original jury verdict and then consider anew, from the perspective of the hypothetical rational fact finder in a backward-looking fashion, whether the newly-discovered evidence, in combination with the evidence adduced at trial that is not in conflict with the credible new evidence, could support a finding of guilt beyond a reasonable doubt. This subsequent evidentiary interpretation cannot conflict with the findings of the circuit court.

The dissent emphasizes that a rational trier of fact "*could* have found Turner guilty beyond a reasonable doubt" because "the [original] jury did." However, as mentioned above, we must supplant the original verdict with this credible recantation. To say that a rational trier of fact could have found the petitioner guilty because the original jury did would mandate the dismissal of every petition for a writ of actual innocence.

In summation, the dissent makes a fatal leap in logic from Turner's possible desire to engage in sexual intercourse to his alleged intent to defile Evans. Turner's talk of engaging in a threesome, however crass and distasteful, does not establish an intent to defile because no evidence indicates Turner would have forced Evans to engage in such an act against her will. We conclude as a matter of law that no rational trier of fact could make such an inferential leap on this record.

## III.

### RELIEF UNDER WRIT

▮▮▮ Pursuant to Code § 19.2–327.13:

in the event that the Court finds that no rational trier of fact could have found sufficient evidence beyond a reasonable doubt as to one or more elements of the offense for which the petitioner was convicted, but the Court finds that there remains in the original trial record evidence sufficient

to find the petitioner guilty beyond a reasonable doubt of a lesser included offense, the court shall modify the order of conviction accordingly and remand the case to the circuit court for resentencing.

Our task is to determine whether under the statutory framework, Turner is guilty of a lesser-included offense, namely of being an accessory after the fact. Turner concedes that if accessory after the fact is a valid lesser-included offense, the evidence is sufficient to find him guilty pursuant to Code § 19.2–327.13.

After the presentation of the evidence, the parties agreed on the jury instructions, including Instruction 11, which states:

The Court instructs the jury that the defendant is charged with the crime of first-degree murder. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:

\* \* \* \* \* \*

If you find that the Commonwealth has failed to prove beyond a reasonable doubt that the defendant is guilty of felony murder but if you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the following elements:

1. That Billy Joe Brown committed the crime of murder against Jennifer L. Evans; and

2. That the defendant knew that Billy Joe Brown had committed the murder of Jennifer L. Evans; and

3. That the defendant comforted, relieved, hid or in any other way assisted Billy Joe Brown, with the intent of helping Billy Joe Brown escape or delay capture, prosecution or punishment;

then you shall find the defendant guilty of being an accessory after the fact to the crime of murder and fix his punishment at:

1. Confinement in jail for a specific time, but not more than twelve (12) months; or

2. A fine of a specific amount, but not more than $2,500.00;

3. Confinement in jail for a specific time, but not more than twelve (12) months, and a fine of a specific amount, but not more than $2,500.00.

If you find that the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the above elements of the offense, then you shall find the defendant not guilty.

Code § 19.2-327.13 makes clear that this Court may "modify the order of conviction accordingly and remand the case to the circuit court for resentencing" only where there is sufficient evidence "to find the petitioner guilty beyond a reasonable doubt of a *lesser-included offense.*" (Emphasis added). In *Commonwealth v. Dalton,* 259 Va. 249, 254, 524 S.E.2d 860, 863 (2000), the Supreme Court of Virginia expressly held that "the crime of being an accessory after the fact is not a lesser-included offense of the crime of murder." The Court further held that "before a defendant can be tried and convicted of being an accessory after the fact, he must be charged with that offense." [9] *Id.* at 255, 524 S.E.2d at 863.

The question we must decide is whether the instruction allowing Turner to be convicted of being an accessory after the fact, generally treated as a lesser-included offense to murder at the time of Turner's conviction, became the law of the case. "It is well settled that instructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review." *Ludwig v. Commonwealth,* 52 Va.App. 1, 12, 660 S.E.2d 679, 684 (2008)

---

9. In so ruling, the Court did not "change[ ] the quantum of evidence necessary to sustain a conviction," *Carmell v. Texas,* 529 U.S. 513, 530, 120 S.Ct. 1620, 1631, 146 L.Ed.2d 577, 593 (2000), but instead merely clarified an existing procedural practice of instructing the jury on lesser-included offenses, *see Pilcher v. Commonwealth,* 41 Va.App. 158, 164–65, 583 S.E.2d 70, 73 (2003) (explaining that changes in procedural laws only violate *ex post facto* principles "when one of four recognized categories of *ex post facto* law is implicated"). *See generally Hopt v. Utah,* 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262, 269 (1884) ("[A]lterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt . . . relate to modes of procedure only. . . .").

(quoting *Owens–Illinois v. Thomas Baker Real Estate*, 237 Va. 649, 652, 379 S.E.2d 344, 346 (1989)). Here, both parties agreed to include the crime of being an accessory after the fact as a lesser-included offense in the instruction. To that extent, Turner was on notice that he faced the possibility of criminal liability as an accessory after the fact. *Cf. Dalton*, 259 Va. at 255, 524 S.E.2d at 863 (*"Unless such a charge is specifically made*, neither the Commonwealth nor an accused is entitled to an accessory-after-the-fact instruction." (emphasis added)). Turner further concedes that, as a result of these jury instructions, law-of-the-case principles require us to treat the crime of being an accessory after the fact as a lesser-included offense of murder. Thus, the rule in *Dalton* does not apply, and we accept Turner's concession that he is guilty of being an accessory after the fact.

Code § 18.2–19 defines the crime of accessory after the fact as a Class 1 misdemeanor. The maximum punishment for an accessory after the fact is twelve months. Code § 18.2–11 further defines the punishment for this misdemeanor as "confinement in jail for not more than twelve months and a fine of not more than $2,500, either or both." As of this date, Turner has served more than thirteen years in prison. Thus, he has served the statutory maximum for being an accessory after the fact, and remand for resentencing is unnecessary.

## IV.

## CONCLUSION

For these reasons, we hold that Turner has met his burden of proving, by clear and convincing evidence, that the recantation is truthful, and that, had the statement been produced at trial, "no rational trier of fact could have found proof of guilt [of felony murder and abduction with intent to defile] beyond a reasonable doubt." Code § 19.2–327.11(A)(vii). Further, we hold the evidence sufficient to find Turner guilty beyond a reasonable doubt of being an accessory after the fact, a conviction allowed under the instructions agreed to at his trial, but do not remand for resentencing. Accordingly, we grant

his petition for a writ of actual innocence and vacate Turner's convictions for first-degree murder and abduction with intent to defile. We further remand this matter to the circuit court with instructions to modify the order of conviction to reflect Turner's conviction of being an accessory after the fact.

POWELL, J., dissenting.

I agree with the majority's analysis of the applicable standard of review in this case. But before this Court may properly grant the writ of actual innocence that petitioner seeks, petitioner must demonstrate by clear and convincing evidence that based on all of the evidence in the record, "*no* rational trier of fact *could* have found proof of guilt beyond a reasonable doubt." Code § 19.2–327.11(A)(vii) (emphasis added); *accord Carpitcher v. Commonwealth,* 273 Va. 335, 344, 641 S.E.2d 486, 491 (2007). It is this Court's statutory duty to examine the entire record, including Brown's credible confession to murder, to determine whether Turner has met his burden. *See* Code §§ 19.2–327.11 to 19.2–327.14. This analysis is not as simple as merely accepting the circuit court's determination that Brown testified credibly that he acted alone when he physically committed the murder and that Turner played no role in the restraint of Evans as clear and convincing evidence that Turner did not abduct Evans with the intent to defile her or that he is not guilty of felony murder.[10] Unlike, the majority, I do not find that Turner has met his statutory burden. Therefore, I would dismiss petitioner's request for a writ of actual innocence, and I respectfully dissent.

## I. ABDUCTION WITH INTENT TO DEFILE

At the evidentiary hearing, the circuit court found that "Brown is credible in his assertion that he acted independently

---

**10.** The majority, in footnote 3, states that "[t]o disregard the circuit court's credibility determination would render the entire evidentiary hearing meaningless." To accept the circuit court's factual determinations divorced from their place in the entire record would render meaningless the role of this Court and the statutory scheme providing for a writ of actual innocence.

in murdering the victim and that ... Turner played no role in the murder or in the restraining of the victim." The relevant question is not whether Brown acted alone in killing Evans, but whether Turner abducted her with the intent to defile her. If he did, the fact that Brown may have acted alone in committing the murder does not absolve Turner of his guilt. I find that the facts and the law indicate that Turner is guilty of abduction with the intent to defile and therefore is also guilty of the felony murder.

Turner was convicted of abduction with intent to defile pursuant to Code §§ 18.2–47 and 18.2–48. Code § 18.2–47 provides in relevant part

[a]ny person who, by force, intimidation or deception and without legal justification or excuse, seizes, takes, transports, detains or secretes the person of another, with the intent to deprive such person of his personal liberty ... shall be guilty of abduction.

The majority opines that because the circuit court found that Brown was "credible in his assertion that he acted independently in murdering the victim and that ... Turner played no role in the murder or in the restraining of the victim," the circuit court addressed the question as to whether Turner abducted Evans with the intent to defile in the negative. The majority further opines that because the circuit court so found, Turner is entitled to have his petition granted. I find that a clear reading of Code §§ 18.2–47 and 18.2–48 indicates that the circuit court did not address the issue of whether Turner abducted Evans with the intent to defile. Because the circuit court did not address that issue, this Court must. Moreover, because Turner is unable to prove by clear and convincing evidence that no rational finder of fact could have found him guilty, his petition should be dismissed.

I agree with the majority that kidnapping, which our legislature has declared is synonymous with abduction, is not defined in the Virginia Code. The majority relies on *State v. Dix*, 282 N.C. 490, 193 S.E.2d 897, 898 (1973) for its position that at common law, kidnapping required proof of both "an unlawful

restraint" and "an asportation." *Dix* recognized that kidnapping was defined generally as the unlawful taking and carrying away of a human being against his will by force, threats or fraud. *Id.* A related offense, false imprisonment was defined as the illegal restraint of a person against his will. *Id.* The court in *Dix* went on to recognize that their jurisprudence held that the unlawful detention of a human being against his will was false imprisonment, not kidnapping. *Id.* (citing *State v. Ingland,* 278 N.C. 42, 178 S.E.2d 577, 582 (1971)). "The element of carrying away was the differentiating factor between the two offenses." *Id.* at 899. Thus, the court recognized that there was some degree of tension in the definition of kidnapping, specifically with regard to the degree of asportation required to turn a false imprisonment into a kidnapping. The court reconciled the tension by holding that in addition to unlawful restraint, the taking, carrying away, transportation or asportation of the victim from the place where seized to some other place is an essential element of common law kidnapping. *Id.* at 904. I agree with the majority that *at common law* every kidnapping involved some degree of restraint.

However, in both Virginia and North Carolina, abduction has since been modified by statute. Our Supreme Court has recognized that Code § 18.2–47 supersedes the common law. *Scott v. Commonwealth,* 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984).

To the extent that the majority would limit Code § 18.2–47 such that the only difference from the common law is that Code § 18.2–47 now allows a conviction for abduction upon proof of a detention without any asportation, stating that the statutory language provides no indication that the legislature has removed the "restraint" requirement, the majority construes the statute too narrowly. Indeed, our Supreme Court has specifically stated "we shall construe [Code § 18.2–47] according to its plain meaning and evident intent. Because [Code § 18.2–47] casts its several prohibited acts in the disjunctive, each is independently sufficient to support a conviction." *Scott,* 228 Va. at 526, 323 S.E.2d at 576; *see also* John

L. Costello, *Virginia Criminal Law and Procedure* § 7.1 (2009) ("This codal section supercedes [sic] the common law, but includes its several offenses [false imprisonment, kidnapping and abduction] by virtue of the disjunctive presentation of the parts of each of the elements").

Our Supreme Court arrived at the holding in *Scott* in reliance on another North Carolina case: *State v. Fulcher*, 294 N.C. 503, 243 S.E.2d 338 (1978). In *Fulcher*, the North Carolina Supreme Court considered whether one could be convicted of kidnapping where there was no asportation. 243 S.E.2d at 351. In doing so, the court interpreted a statute very similar to Virginia's. As our Supreme Court stated in *Scott*, the North Carolina statute provided, in pertinent part, "[A]ny person who shall unlawfully confine, restrain or remove from one place to another, any other person . . . without the consent of such person, shall be guilty of kidnapping. . . ." 228 Va. at 525–26, 323 S.E.2d at 576 (quoting N.C. Gen.Stat. § 14–39(a)). The North Carolina Supreme Court held that their legislature rejected their previous decisions holding that there must be both detention and asportation of the victim, because the statute plainly stated confinement, restraint *or* removal. *Fulcher*, 243 S.E.2d at 351.

That court went on to define the terms used in its statute as follows:

[T]he term "confine" connotes some form of imprisonment within a given area, such as a room, a house or a vehicle. The term "restrain" while broad enough to include restriction upon freedom of movement by confinement, connotes also such a restriction by force, threat or fraud, without a confinement. Thus, *one who is physically seized and held, or whose hands or feet are bound, or who, by the threatened use of a deadly weapon, is restricted in his freedom of motion is restrained* . . . .

*Id.* (emphasis added). Throughout the opinion, asportation was defined as the carrying away of the victim. *See id.* at 350.

The reasoning of the North Carolina Court in *Fulcher*, which was found persuasive by our Supreme Court in *Scott*, is

equally applicable to the interpretation of our statute. Because our statute is plainly written in the disjunctive, it is clear that restraint is no longer a requirement of abduction as the legislature has declared one who seizes, takes, transports, detains,[11] *or* secretes for any one of the prohibited purposes commits an abduction, as each action is independently sufficient to support a conviction.

Therefore, because restraint need not be an element of an abduction, the majority incorrectly concludes that because we presume that the circuit court knows and correctly applied the law, we can presume that the circuit court's conclusion that Turner did not restrain Evans means that Turner did not abduct her with the intent to defile. However, the circuit court was not asked to determine whether Turner abducted Evans with intent to defile. Thus, the majority's presumption is based on their assumption that the circuit court knew and correctly applied the law to a question that was not asked.

Our case law is clear that, under Code § 18.2–47, an abduction occurs where the perpetrator detains or moves his victim "by force, intimidation, or deception." *Scott,* 228 Va. at 526, 323 S.E.2d at 576. In *Jerman v. Dir. of the Dep't. of Corr.,* 267 Va. 432, 439, 593 S.E.2d 255, 259 (2004), the Supreme Court of Virginia found that an abduction occurred where the evidence proved that one of the petitioner's confederates convinced the victim to come with her under the ruse of selling illegal narcotics to her and petitioner when their true intent was to harm the victim. *See also Taylor v. Commonwealth,* 260 Va. 683, 688, 537 S.E.2d 592, 595 (2000) (holding that the appellant accomplished the abduction through the use of both deception and intimidation). Our Supreme Court made no

---

11. Clearly the word "detains" is synonymous with "restrains." The majority defines "restrain" as "to 'control' or 'to take away freedom or liberty of.' " Webster's defines "detain" as "to hold or keep in . . . as if in custody, to keep back, to restrain." *Webster's Third International Dictionary* 616 (1993). The use of the word "detain" further indicates that "restraint" is no longer an element of kidnapping in addition to each of the enumerated acts. To so hold would mean that the Commonwealth would have to prove not only that the victim was "detained" but also that the victim was "restrained."

mention of any "restraint" upon the victim in the first abduction in *Jerman;* rather, the fact that the victim was tricked into getting into the vehicle and traveling with the co-conspirator was enough to prove abduction. Thus, if based on all of the evidence before this Court, any rational fact finder could have concluded that Turner deceived Evans into leaving the club while at the same time intending to defile her, then a writ of actual innocence should not issue.

The majority refers to *Kent v. Commonwealth,* 165 Va. 840, 841–42, 183 S.E. 177, 177–78 (1936), and *Jerman* as cases where the appellants told "specific lies" to accomplish the abductions. *Supra* § II.B. However, Code §§ 18.2–47 and 18.2–48 do not require that the deception be verbalized and, certainly, it is well settled that one's intention, such as the intent to deceive, may and often must be proven through the use of circumstantial evidence. *Williams v. Commonwealth,* 278 Va. 190, 194, 677 S.E.2d 280, 282 (2009) (reiterating that "[a]bsent a direct admission by the defendant, intent . . . must necessarily be proved by circumstantial evidence"). To prove that Turner abducted Evans with the intent to defile, the Commonwealth was required to prove that he had the specific intent to sexually molest her. *Simms v. Commonwealth,* 2 Va.App. 614, 617, 346 S.E.2d 734, 735 (1986). "Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case." *Ridley v. Commonwealth,* 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979). Petitioner's acts, conduct, and statements may be considered to discern his state of mind. *Id.; accord Long v. Commonwealth,* 8 Va.App. 194, 198, 379 S.E.2d 473, 476 (1989). "The [trier of fact] may consider the conduct of the person involved and all the circumstances revealed by the evidence." *Hughes v. Commonwealth,* 18 Va.App. 510, 519, 446 S.E.2d 451, 457 (1994) (quoting *Wynn v. Commonwealth,* 5 Va.App. 283, 292, 362 S.E.2d 193, 198 (1987)).

When weighing the evidence, the fact finder is not required to accept entirely either party's account of the facts. The fact finder may reject that which it finds implausible, yet accept other parts which it finds to be believable.

*Barnes v. Commonwealth,* 33 Va.App. 619, 630, 535 S.E.2d 706, 711–12 (2000) (citing *Barrett v. Commonwealth,* 231 Va. 102, 107, 341 S.E.2d 190, 193 (1986)).

Because it is Turner's intent that is relevant, Brown's credible confession to killing Evans cannot be found to be dispositive of what Turner was thinking when he left the club with Evans. Indeed, Brown's confession only establishes what occurred after he got into the car with Turner and Evans.[12] Thus, it does not change the evidence of Turner's intent to defile that was before the jury in Turner's trial. That jury was instructed that abduction with the intent to defile could be accomplished by, *inter alia,* deception and could have found that Turner deceived Evans into leaving the bar, his nefarious intent unbeknownst to her.[13] Thus, it cannot be said that *no*

---

12. In his confession, Brown reiterates his prior statements that he did not intend to have sex that night. His recent confession, however, has no bearing on what a reasonable fact finder could find about Turner's and Brown's sexual intent prior to Brown joining Evans and Turner in Turner's car because Brown's confession focused on the details of how he killed Evans and what followed after he met them in the car. Specifically, this was not part of what the trial court was asked to decide, nor is this issue of Brown's sexual intent part of the circuit court's findings. Indeed, Brown's protestations that he was not sexually interested in Evans are belied by his interview with Turner's attorney and by his own testimony at the evidentiary hearing where he recounts his sexual overtures toward Evans immediately upon getting into Turner's car and admits to trying to have intercourse with Evans' corpse twice, once before they even left the parking lot and again in the woods where they disposed of Evans' body.

13. Though the record, unfortunately, is devoid of the closing arguments made to the jury in Turner's trial, it is clear from the trial court's ruling on Turner's motion to strike and from the jury instructions that the abduction by deception theory was advanced in the trial court. In ruling on Turner's motion to strike, the trial court held that there was sufficient evidence from which a fact finder could conclude that Evans did not

knowingly and willingly [go] with ... Turner to the parking lot or to his car for the purposes of engaging in a threesome or what has been discussed as group sex with [Turner] and ... Brown; but we certainly know from the evidence in this case that that was the defendant's intent.... It's clear from all the circumstances in evidence in this case that the defendant had a sexual mode; and, of course, his specific intent to defile or sexually molest ... can be derived not only from his conduct *but from his statements as well.*

rational trier of fact *could* have found Turner guilty beyond a reasonable doubt as the jury did.

Moreover, a review of the entire record before this Court reveals that it is replete with evidence from which a rational finder of fact could reach a conclusion that Turner deceived Evans into leaving the club with him for stated innocent purposes while his true intent was to defile her. Turner avowed that he only wanted to talk with Evans and that he had no sexual interest in her. Turner's actions and, more tellingly, his own words on the night Evans was murdered belie his claim that he did not intend to have sex with Evans. Turner went out of his way to arrange for Karen Bishop, Brown's ex-girlfriend, to give Brown a ride home if Turner did not return to the club by closing time. During that conversation, Bishop asked Turner if she needed to give Brown a ride home because Turner "was going home with [Evans], and [Turner] said yes." Bishop warned Turner that "if that's what [he's] going to do, use a condom." Turner just smirked and laughed in response.

The most telling piece of evidence is a conversation that occurred after Turner arranged for Bishop to give Brown a ride home and after he professed his intent to have sex with Evans to Bishop. Julio Fitzgibbons, a Navy SEAL, met Turner and Brown the night Evans was murdered and they talked about the SEAL training program for some time before parting ways. Toward the end of the night and after Turner had arranged a ride for Brown, Fitzgibbons approached Turner and Brown to see whether they had any plans for that night. While Evans was standing approximately fifteen yards away, Turner told Fitzgibbons that he and Brown were going to have a "threesome" with Evans.[14] Within a few seconds of

---

(Emphasis added).

**14.** Fitzgibbons testified that he understood "threesome" to mean a sexual encounter involving Turner, Brown, and a woman, in this instance, Evans. Though the majority suggests that this may have been an allusion to a prior incident in which Turner and Brown engaged in a "threesome," the argument makes no sense given that Fitzgibbons did

this, Evans approached and Turner introduced her to Fitzgibbons as she stood next to Brown. Before leaving, Fitzgibbons gave them the thumbs up sign, which Turner returned. Turner had a smile on his face.[15]

While Turner denies having made this statement, his petition for a writ of actual innocence supports this sequence of events and the fact that there was an exchange with him, Brown, and Fitzgibbons regarding a "threesome." In paragraph forty-seven of his petition, Turner states under oath

Petitioner was happy with Bishop's response and he went to tell Brown about the arrangements. Petitioner remarked that the plan was if he wasn't back by 2:00 a.m., Bishop should take Brown home. Brown asked Petitioner where he was going with "that chick," and Petitioner explained. Brown was slurring his words and asked Petitioner what the chances were for him to "get it on with her *too*." At that moment, [Fitzgibbons] walked up to them and asked what their plans were for the night. Brown said something to the effect, "I'm going to get a threesome going."

(Emphasis added).

Turner confirms that he talked with Brown after the arrangements were made with Bishop to take Brown home. Based on his version of Brown's response to Turner's description of his plans with Evans, it is clear that Turner planned to have a sexual encounter with Evans as Brown's response was to inquire about the chances of him "getting it on with her *too*." (Emphasis added). The evidence is also clear that the plan was formulated for both Turner and Brown to have sex with Evans as Fitzgibbons was told that they were going to have a "threesome." While Turner tries to attribute the "threesome" comment to Brown, Fitzgibbons was clear that it was a declaration made by Turner. Clearly, Brown and

---

not know Brown and Turner or their sexual histories. Such an allusion would certainly have been lost on Fitzgibbons.

15. Several other witnesses also testified that Turner and Brown had a history of engaging in "threesomes."

Turner made a plan before either left the club to have sex with Evans.[16]

Finally, Turner's intent to have sex with Evans, even though not even he believed Evans would agree, is clear from what was not said. Evans' friend, Burdette, described Evans as a woman who would not speak to anyone using sexual overtures. Burdette also testified that she believed that Evans would not have been speaking to Turner had he made any sexual invitations to Evans. Evans' other friend, McCammon, similarly believed that Evans had no intent to have a "romantic interlude" that night. As further proof of his intent to defile Evans, Turner confirms these descriptions of Evans. He testified that during the course of the evening, he never discussed sex with her. He also echoed Evans' friends with regard to her character. Specifically, he stated that in the short time he spent with her, Evans was not the kind of woman who would have engaged in a "threesome." Yet, he spoke to two different people about having sex with her, although she and he had not discussed it. Moreover, he unreservedly declared that he was going to have a "threesome" with Evans and Brown, even though he did not believe she would have willingly engaged in a "threesome." From this, a rational trier of fact could conclude that Evans was unaware of Turner's sexual plans for her, and would not have willingly engaged in a "threesome," but that that was his intention.

The record also contains evidence of Turner's aggressive nature, especially when things were not going his way. Burdette testified that Turner was "exceptionally rude" to her and McCammon, that he spoke to them in a "horribly belligerent tone[,]" and that he "pulled the [car] door open with surprising

---

**16.** While the majority contends that Turner's statements regarding a threesome were implicitly rejected by the circuit court and negate the inculpating evidence against Turner, this simply is not the case. For all of the previously stated reasons, the circuit court was never asked to reach, nor did it reach the issue of whether Turner abducted Evans by deception with the intent to defile.

force" when he and Evans finally prevailed and the plan was devised for Evans to stay with Turner for one additional hour.

Turner's callous disregard for Evans, displayed after her murder, is consistent with a finding that he intended to defile her before she was murdered. Within minutes of Brown killing Evans, Turner took the lead in finding an isolated spot to dispose of her body. Both men testified that Brown passed out within seconds of killing Evans. However, rather than making known what occurred, Turner drove from Virginia Beach to a secluded area in a Newport News park where it was unlikely that Evans' body would be found. After finding the appropriate spot, he then woke Brown up to assist him in moving and covering Evans' body. The day after Turner claimed to have witnessed Brown end a young woman's life without any provocation, Turner still desired to rent an apartment with Brown. When lying to police and Federal Bureau of Investigation officials about leaving the club separately from Evans, an FBI officer interviewing Turner found him to be "very calm, very collected." Another police officer present for the interview said that Turner "seemed calm, cool. Had his thoughts about him and talked very straightforward." A few days after the police and FBI officers visited Turner and Brown at the naval base to interview them, the men went to Pizza Hut with Matt Novello, a Navy boatswain mate. Brown had brought the current, local newspapers with him. One of the newspapers contained a composite sketch purportedly of Turner. Throughout the meal, Turner and Brown repeatedly laughed and joked that the sketch looked nothing like Turner.

Thus, the record provides ample evidence of Turner's determination to spend time with Evans, his aggressive demeanor toward her friends, and his unremorseful reaction after witnessing Brown end Evans' life. There is also significant, contradictory evidence of Turner's claim that he had no interest in having sexual relations with Evans and his attempts to facilitate such relations. The evidence further proves that Turner walked Evans to his car on the pretext of waiting for her friends. He did not disclose to her his stated intention to Fitzgibbons to have a "threesome" with her and Brown.

Certainly, the act of engaging in a "threesome" does not, in and of itself, provide evidence of Turner's intent to defile Evans. However, the evidence in the record when considered as a whole—including Turner's belief that Evans would not be receptive to sexual advances, Turner's claim to police and at trial that he had no interest in having sexual relations with Evans, and his declaration to Fitzgibbons that he intended to have a "threesome" with Evans-enables a rational trier of fact to infer that Turner intended to have sexual relations with Evans against her will.

## II. FELONY MURDER

"[M]urder for purposes of the felony-murder statute is common-law murder coupled with the contemporaneous commission or attempted commission of one of the listed felonies[,]" including abduction with intent to defile. *Wooden v. Commonwealth*, 222 Va. 758, 761, 284 S.E.2d 811, 813 (1981). "[T]he felony-murder statute applies where the killing is so closely related to the felony in time, place, and causal connection as to make it a part of the same criminal enterprise." *Haskell v. Commonwealth*, 218 Va. 1033, 1044, 243 S.E.2d 477, 483 (1978).

> In adjudging a felony-murder, it is to be remembered at all times that the thing which is imputed to a felon for a killing incidental to his felony is *malice* and *not the·act of killing.* The mere coincidence of homicide and felony is not enough to satisfy the requirements of the felony-murder doctrine.... "Death must be a consequence of the felony ... and not merely coincidence."

*King v. Commonwealth*, 6 Va.App. 351, 356, 368 S.E.2d 704, 707 (1988) (quoting *Commonwealth v. Redline*, 391 Pa. 486, 137 A.2d 472, 476 (1958)). Abduction is a continuing offense and " 'it [is] for the fact finder to determine in each case ... whether the [abduction] had been terminated within the purview of [Code § 18.2–32].' " *Barnes*, 33 Va.App. at 629, 535 S.E.2d at 711 (quoting *Haskell*, 218 Va. at 1043, 243 S.E.2d at 483).

As discussed above, the record *in toto* provides sufficient evidence from which the trier of fact could conclude that Turner deceived Evans into going to his car with the true intent of both he and Brown having a "threesome" with Evans against her will. The evidence further shows that when Brown joined Evans and Turner in Turner's car, Brown asked Evans whether she was a virgin and whether she had ever had sex with a "frogman" immediately before "snapping" and killing her. Moreover, Brown was present when Turner told Fitzgibbons that he and Brown intended to have a "threesome" with Evans. From this evidence, a rational trier of fact *could* conclude that Brown and Turner intended to forcibly have sexual relations with Evans and that Brown killed Evans when she rebuffed his advances. The trier of fact could have found that because of this shared sexual desire, the abduction had not ended.[17] Thus, I do not believe that this Court can find that Brown's credible recantation provides this Court with clear and convincing evidence that no rational fact finder could have found that Turner used deception to abduct Evans with the intent to have sexual intercourse with her against her will and, therefore, I dissent.

---

Because the issues addressed herein are of first impression and potential litigants and members of the bar may benefit from the directives herein, we direct the Clerk to publish this order.

---

17. The majority's determination that "[t]he circuit court, by referring to the murder and the restraint in the disjunctive, contemplated Brown's recantation in light of both the actual killing and the underlying crime of abduction" is unsupported and requires an inferential leap.